No. 87-218

IN THE SUPREME COURT OF THE STATE OF MONTANA

1987

_____

WILLIAM ALBERS,

              Plaintiff and Respondent,

    -vs-

BAR ZF RANCH, INC.,

              Defendant and Appellant.

_____

APPEAL FROM:  District Court of the Twelfth Judicial District,
             In and for the County of Chouteau,
             The Honorable Chan Ettien, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Jardine, Stephenson, Blewett & Weaver; K. Dale
        Schwanke, Great Falls, Montana

    For Respondent:

        Luxan & Murfitt; Jack M. McLean, Helena, Montana

_____

Submitted on Briefs:  Sept. 17, 1987

Decided:  December 17, 1987

Filed: DEC 17 1987

_____

Clerk

Mr. Justice L. C. Gulbrandson delivered the Opinion of the Court.

The Bar ZF Ranch appeals a Chouteau County District Court judgment awarding William Albers (Albers) damages and costs of suit for breach of an oral contract. The District Court, sitting without a jury, found that the Bar ZF Ranch (Bar ZF) breached its obligation to allow Albers to participate in the 1982 federally sponsored farm subsidy program on farm land owned by Bar ZF and leased by Albers. The District Court awarded Albers $18,671.04 for loss of farm program deficiency payments, storage payments, and loss in sales price of grain. The District Court also awarded Albers prejudgment interest pursuant to § 27-1-211 and § 30-1-106, MCA. Defendant Bar ZF Ranch appeals. We affirm in part, reverse in part, and remand with instructions to recalculate prejudgment interest.

The Bar ZF Ranch is a 3,700-acre farm located in Chouteau County, near Carter, Montana. In 1967, the owners of the Bar ZF, Ray and Audie Lohr, entered into an oral lease agreement with William Albers whereby Albers would farm approximately 1,800 acres on the Bar ZF in exchange for two-thirds of each crop. Albers resides near Fort Benton and farms various farmlands with his brother. The 1,800 acres included approximately 640 acres leased by the Bar ZF from the State of Montana. There are also 2,000 acres of grassland on the Bar ZF that were not Albers' responsibility. Ray Lohr and Albers worked closely together in the operation of the farm, but farm practices were generally left to Albers' discretion. In addition, Albers was to furnish all necessary seed, fuel, fertilizer, machinery, and weed killer.

Ray Lohr died in 1979 and left Mrs. Lohr as the presiding officer of the Bar ZF Ranch corporation. Albers

2

continued to farm the Bar ZF after Ray Lohr's death with very little participation from Mrs. Lohr in day-to-day farming operations. Albers decided what crops to plant on what acreage and whether to participate in the federal farm program. On March 24, 1982, Mrs. Lohr applied to participate in the farm subsidy program with the Agricultural Stabilization and Conservation Service (ASCS), United States Department of Agriculture. Mrs. Lohr signed and filed the ASCS papers at Albers' request, but she later professed ignorance as to the general requirements and procedures of the farm program.

To be eligible for farm subsidy benefits for wheat, the Bar ZF was required to limit wheat planting to 712.5 acres. At the time of the ASCS application, Albers had approximately 705 acres of winter wheat seeded on the Bar ZF. Under the wheat subsidy program as it then existed, the Bar ZF would have qualified for deficiency payments and annual storage payments for 1982 wheat stored in the federal government reserve loan program.

During the winter of 1981, Mrs. Lohr decided to retain a permanent tenant for the Bar ZF so she could move to Fort Benton for health reasons. Thereafter, Mrs. Lohr entered into an oral farm lease with Robert Bronec (Bronec) whereby Bronec would farm and live on the Bar ZF after the 1982 harvest. This agreement was later reduced to writing in the fall of 1982. Mrs. Lohr did not ask Albers to live on the Bar ZF because Albers had his own farm near Fort Benton. Albers was not informed of the Bronec lease until the end of March, 1982. Mrs. Lohr gave Albers written notice of the termination of his lease in a letter dated April 5, 1982. The letter required Albers to summerfallow the Bar ZF before quitting the property. Mrs. Lohr's April 5th letter also expressed her satisfaction with the general working

3

relationship between the Lohrs and Albers since Albers began farming the Bar ZF in 1967.

Upon learning that his lease with the Bar ZF was to end, Albers decided not to participate in the farm subsidy program. Instead, Albers determined that the heavy stubble and reserve moisture on the Bar ZF acreage would provide ideal conditions for burning and recropping. Albers testified at trial that he discussed his intentions with Mrs. Lohr and they agreed that Albers could withdraw from the farm subsidy program and recrop one-half of the Bar ZF stubble acreage. The Bar ZF apparently had never been recropped in this manner and Mrs. Lohr was reluctant to agree to Albers' request. Mrs. Lohr testified that she was "unclear" as to whether she told Albers he could recrop and that she probably told him to discuss the matter with Bronec.

Albers prepared for the reseeding by burning a 184.6 acre field and by preparing a fire guard around another 94.5 acre field on May 1, 1982. Albers also cleaned seed grain, bought fertilizer, and moved machinery in preparation for the recropping. Mrs. Lohr noticed the smoke from the May 1st burning and personally delivered a note to Albers that afternoon to demand that he quit burning stubble. Mrs. Lohr objected to recropping at that time because she believed that recropping would hurt the subsequent tenant, Bronec, and because she believed there was insufficient reserve moisture in the soil. Albers testified that Mrs. Lohr appeared very upset and that he acquiesced to her demands in concern for her health.

Sometime after May 1, 1982, Mrs. Lohr had Bronec probe the soil on the Bar ZF to determine if there was sufficient moisture to recrop. The probes revealed marginal to sufficient moisture on the fields in question. On May 3, 1982, Mrs. Lohr contacted the Montana State Department of

4

Lands to request permission to recrop the 640 acres of State land leased to the Bar ZF.

Albers returned to the Bar ZF on May 5, 1982, and talked with Mrs. Lohr about what to do with the farm. They agreed that Albers would be excused from leaving summerfallow on the Bar ZF in exchange for his assurance that he would attempt no further recropping. The parties exchanged written agreements to that effect. Albers testified at trial that he also told Mrs. Lohr that he would again be participating in the farm subsidy program for wheat on the Bar ZF if she would not allow him to recrop. Mrs. Lohr testified that she was not told that Albers was back in the farm program.

A few days later, Albers observed Bronec planting on the burned acreage. Mrs. Lohr had given Bronec permission to seed the burned acreage to prevent erosion. Albers did not talk to Bronec and assumed that Bronec was planting barley or some other crop which would not effect the Bar ZF's compliance with the farm program. Bronec seeded two fields to wheat and one to barley by about May 12, 1982. Albers testified that he returned to the Bar ZF around May 19, 1982, to discover that Bronec had planted wheat in an amount sufficient to disqualify the Bar ZF from the farm subsidy program.

On June 22, 1982, Albers had his attorney write Mrs. Lohr to inform her that "the present operator of the Bar ZF Ranch has exceeded the allowable wheat acreage" for compliance with the farm subsidy program and that noncompliance with the program would cause Albers financial damage. Mrs. Lohr returned to the Bar ZF from an out-of-state trip to find the letter on July 1, 1982. Thereafter, Mrs. Lohr had two weeks to bring the Bar ZF in compliance before the July 15, 1982, ASCS deadline. Mrs. Lohr elected not to destroy the additional wheat so as not to

damage Bronec. As a consequence, the Bar ZF was not able to participate in that year's farm subsidy program.

Albers brought suit against the Bar ZF on November 14, 1984. In his amended complaint, filed on July 29, 1986, Albers alleged breach of contract, estoppel, bad faith, constructive fraud, unjust enrichment, constructive evictment, and breach of the covenant of quiet enjoyment. The Bar ZF counterclaimed with allegations that Albers failed to summerfallow and failed to control weeds on the Bar ZF. The case was tried before the District Court sitting without a jury on November 17 and 18, 1986. On February 6, 1987, the District Court issued its findings, conclusions, and decree awarding Albers contract damages, prejudgment interest and costs. The Bar ZF appeals and raises the following issues:

(1) Did the District Court err in determining that the Bar ZF had a legal duty to William Albers?

(2) Was there sufficient evidence to support the District Court's award of damages to Albers?

(3) Did the District Court err in awarding Albers prejudgment interest?

(4) Did the District Court err in denying Bar ZF's counterclaims?

In its first issue, the Bar ZF argues that it owed no obligation, or duty, to assure that Albers was in compliance with the farm subsidy program requirements. The District Court made the following findings and conclusions relevant to this issue.

> 6. The court concludes that the oral, year-to-year agreement between the Bar ZF and Albers was a lease.
>
> 7. Lohr and Albers appeared to farm within the customary practices applying to oral leases in the area.

6

8. The lessee was obligated to follow the better customary farm practices in the community.

. . .

11. The Bar ZF had the obligation to allow Albers to operate and farm his 1982 winter wheat crop in a way which would bring him (and Bar ZF) the highest return. Mrs. Lohr had an obligation under the oral lease to cooperate with Albers' staying in the [farm subsidy] program.

. . .

14. When Mrs. Lohr and Albers signed the May 4-5 agreement, the highest return then was for Albers and the Bar ZF to bring their wheat within the [farm subsidy] program. Mrs. Lohr had an obligation under the oral lease to cooperate with Albers in staying in the program, so that the highest return could be achieved.

Mrs. Lohr 's failure and refusal to achieve compliance and inclusion in the wheat program, when she was able to do so, was a breach of the oral contract.

15. The Bar ZF, through Mrs. Lohr, prevented Albers from participating in the wheat program, and he suffered damages. [Additions ours.]

The Bar ZF contends that the District Court erred in finding that it owed an obligation to Albers. We will not reverse the order of the District Court unless we determine that the District Court's findings were clearly erroneous and result in an abuse of discretion. Rule 52(a), M.R.Civ.P.; Walker v. Larson (Mont. 1986), 727 P.2d 1321, 1322-23, 43 St.Rep. 1765, 1767. We will not disturb those findings that are supported

7

by substantial credible evidence. In re the Matter of B.T. (Mont. 1986), 725 P.2d 230, 232, 43 St.Rep. 1728, 1730. The evidence will be reviewed in a light most favorable to Albers as the prevailing party. Cameron & Jenkins v. Cameron (1978), 179 Mont. 219, 587 P.2d 939.

The Bar ZF incorrectly construes § 27-1-105, MCA, to characterize its obligation as arising by operation of law rather than by contract. An obligation is defined as "a legal duty by which a person is bound to do or not to do a certain thing." Section 28-1-101, MCA. An obligation can arise by either contract or operation of law. Sections 27-1-105 and 28-1-102, MCA. We find, as did the District Court, that the oral lease in question served as a contract through which each party acquired their respective obligations.

In the instant case the parties agreed that, under the terms of the oral farm lease, Albers had an obligation to the Bar ZF to utilize the better farming practices in the community. Albers was given wide discretion in choosing those practices during his lease of the Bar ZF. That discretion increased with the death of Ray Lohr. Mrs. Lohr, on the other hand, professed little knowledge of either specific farming practices or the farm subsidy program. She can, however, be charged with knowledge that Albers intended to either participate in the farm subsidy program or recrop. Mrs. Lohr would not allow Albers to recrop so it was reasonable for her to assume that the only other alternative was for the Bar ZF to remain in the farm subsidy program.

The Bar ZF claims that it was Albers' obligation to assure compliance in the farm program once he discovered that the Bar ZF had been overseeded by Bronec. We disagree. It was Bronec, acting at Mrs. Lohr's direction, who overseeded and disqualified the Bar ZF from the farm program. Albers,

8

through his attorney, requested that the Bar ZF correct the situation to assure compliance with the farm subsidy program by the July 15, 1982, deadline. It was the Bar ZF's actions that caused noncompliance and it was the Bar ZF's obligation then to remedy the situation to assure compliance. Albers' position in this regard is fully supported by the Restatement (Second) of Property § 5.4 (1977), which states:

> There is a breach of the landlord's obligations if, after a tenant's entry and without fault of the tenant, a change in the condition of the leased property caused by the landlord's conduct or failure to fulfill an obligation to repair, . . . makes the leased property unsuitable for the use contemplated by the parties and the landlord does not correct the situation within a reasonable time after being requested by the tenant to do so.

The Bar ZF also calls into question the District Court's interpretation of numerous other facts. These arguments are not persuasive because there is substantial evidence to support the District Court's findings.

Though Mrs. Lohr denied that Albers told her that he intended to participate in the farm program, it is the function of the trial court in a nonjury trial to determine the credibility of the witnesses and the weight to be accorded their testimony. In re the Matter of the Estate of Murnion (Mont. 1984), 686 P.2d 893, 896, 41 St.Rep. 1627, 1630. The District Court chose to believe Albers and we will not disturb that decision. There is substantial credible evidence to support the District Court's finding that the Bar ZF owed Albers an obligation to allow him "to operate and farm his 1982 winter wheat crop in a way which would bring him (and the Bar ZF) the highest return" and an "obligation

9

under the oral lease to cooperate with Albers' staying in the [farm subsidy] program."

The Bar ZF next questions the sufficiency of the evidence to support an award of damages in this action. The Bar ZF argues that there was no guarantee that Albers would participate in the 1982 regular and reserve loan programs or that he would place all of his grain in the programs. In essence, the Bar ZF's argument in this regard is that Albers' damages are too speculative to be recoverable.

Again, we ware charged with reviewing the record to determine if there is substantial credible evidence to support the District Court's findings in this regard. In re the Matter of B.T., supra. Speculative damages not clearly ascertainable are not recoverable. Cremer v. Cremer Rodeo Land and Livestock Co. (Mont. 1981), 627 P.2d 1199, 1202, 38 St.Rep. 574, 578. The terms "speculative damages," however, refer more to an uncertainty or speculation as to whether the loss of profits is a result of the breach of contract in this case than it does to an uncertainty as to the amount of the damages. Bolz v. Meyers (1982), 200 Mont. 286, 300, 651 P.2d 606, 613.

As discussed previously, there is substantial evidence that the Bar ZF breached the oral lease by causing noncompliance with the farm program. There is also substantial evidence to support the District Court's award of damages in this case. Albers will not be denied recovery in this case simply because he had the option to participate in the farm subsidy program. It is evident from the record that participation in the farm subsidy program would have been advantageous to the Bar ZF. Albers also chose to both recrop and participate in the farm program on other operations he farmed. He participated in both the regular and reserve loan programs on two other operations that were so qualified.

10

Albers' decision on the Bar ZF was to participate in the program due to his inability to recrop as planned and as previously agreed to by Mrs. Lohr.

The District Court made the following findings with regard to Albers' damages:

24. Compliance date for the 1982 program was July 15, 1982, meaning that the Bar ZF had until that date to comply with the maximum allowable wheat acreage. Bronec testified that if he had been informed of the problem, he was sure that "something could have been worked out." He also said he could have seeded barley on all three parcels of land had he known it was necessary, or could have cut and baled young wheat for hay for his cattle. Compliance could have been accomplished by July 15, 1982.

25. Mrs. Lohr made no effort to achieve compliance and inclusion in the wheat program. Albers lost all the benefits accruing from compliance.

26. Albers, up to July 15, 1982, was eligible for participation in the farm program, the farm storage grain reserve program, and the Commodity Credit Corporation loan program on the Bar ZF in 1982.

27. Albers was unable to use spring wheat which he had cleaned at a cost of $116.75, and he had not return fertilizer. He received credit on the fertilizer, but incurred 80 miles of needless driving to return it, at a cost of $40.00 (80 miles times $.50).

28. Deficiency payment for the 1982 program was $.50 per bushel paid in December, 1982. The total amount of the deficiency payment for a farm is calculated by multiplying the $.50 per bushel by the assigned yield for the Bar ZF and again by the seeded acreage. The

11

assigned yield for the Bar ZF was 24 bushels per acre in 1982. Albers seeded 705.1 acres of wheat on the Bar ZF on May 5, 1982. Total deficiency payment for the wheat program in 1982 would have been $8,461.20. Albers' share of that deficiency would have been $5,640.80.

29.     Albers had sufficient storage capacity on his own place in 1982 and afterwards, and would have participated in the storage program with his share of the crops from the Bar ZF.

30. Annual storage payments are calculated by multiplying the per bushel annual storage payments by the assigned wheat yield for the Bar ZF by the seeded acreage.

31. The annual storage payment for the three-year reserve program in 1982 was $.265 per bushel, the assigned wheat yeild for the Bar ZF was 24 bushels per acre. Albers had seeded 705.1 acres of wheat. The total annual storage payment for the Bar ZF would have been $4,484.44. Albers would have received two-thirds of this amount, or $2,989.62. Storage payments are made in advance on an annual basis and participants would be eligible to participate for a three years' period. Storage payments were made November 4, 1982. Albers' total loss of storage payments was $8,968.86.

32. Albers would have also participated in both the regular loan program and reserve loan program. Of 700-800 Chouteau County farmers, 641 used the loan program in 1982. Under the regular loan program, participants could have qualified for a loan immediately in this amount of $3.49 per bushel. After nine months, participants would qualify for the reserve loan of $3.94 per bushel. These loans are based on the assigned wheat yield for a particular farm and the actual seeded wheat acres. Usually

12

participants in the program "turnover" their wheat to the Commodity Credit Corporation after three years, and effectively sell their grain for the loan rate. If grain is turned over to the Commodity Credit Corporation, all interest on the loan is forgiven.

33. Albers redeemed part of the 1982 grain which he had in the reserve program in 1983. However, he redeemed his maximum amount allowable under the 1983 PIK program and would have left the Bar ZF grain in storage.

34. The reserve loan V rate [sic] the 1982 farm program was $3.94. The assigned wheat yield for the Bar ZF was 24 bushels per acre. The actual wheat acreage was 705.1.

35. All wheat stored on the Bar ZF Ranch was sold prior to the 1983 harvest. A recap of the sold wheat, based on EXHIBITS 19-A through 19-P . . . [shows 40,291.39 bushels sold for $144,388.70]. $144,388.70 divided by 40,291.39 bushels = $3.58 bushel average selling price.

36. The per bushel sales price for wheat for the Bar ZF was $.36 per bushel less than it would have been under the reserve loan V Program ($3.94 - $3.58 = .36). The Bar ZF would have earned $6,092.06 more if it had participated in the reserve loan V Program in 1982 (36 times 24 bushels of yield times 705.1 seeded acres = $6,092.06). Albers' share of those proceeds would have been $4,061.38.

37. Mrs. Lohr Lohr received two-thirds of the proceeds of the crop which Bronec seeded in May, 1982, or $4,817.66. [Additions ours.]

From these findings the District Court concluded the following:

13

15. The Bar ZF, through Mrs. Lohr, prevented Albers from participating in the farm program, and he suffered damages.

16. Albers incurred the following losses by being precluded from participating in the farm program:

(a) Loss of farm program deficiency payments, received 12/83 - $5,640.80.
(b) Loss of storage payments received, one-third received on 11/4/82, 11/4/83, and 11/4/84 - $8,968.86.
(c) Loss in sales price of grain, received 9/82 - $4,061.38.

. . .

Accordingly, the District Court entered judgment in favor of Albers and against the Bar ZF as follows:

1. For the sum of $5,640.80, with interest of 10% since December 1, 1982.

2. For the sum of $2,989.62, with interest of 10% from November 4, 1982.

3. For the sum of $2,989.62 with interest of 10% from November 4, 1983.

4. For the sum of $2,989.62 with interest of 10% from November 4, 1984.

5. For the sum of $4,061.38, with interest of 10% from September 1, 1982.

6. Plaintiff shall have his costs.

7. The counterclaims are dismissed.

There is substantial evidence in the record to support the District Court's assessment of damages in this case and Albers' damages are subject to calculation with a reasonable degree of certainty. This Court recognizes that "[a]ny award of damages is grounded to a certain degree upon speculation."

14

Sack v. A.V. Design, Inc. (Mont. 1984), 683 P.2d 1311, 1315, 41 St.Rep. 1272, 1276. Damages are not sufficiently speculative in this case to merit reversal.

The Bar ZF argues that the District Court erred in calculating damages by not subtracting the cost of transporting grain to storage. At trial, Albers testified that, before he purchased his own tandem truck, it cost approximately ten cents per bushel to transport his grain the four miles from the Bar ZF to his storage bins in Fort Benton. This Court has long recognized that only the net value of lost crops can be recovered. Agrilease, Inc. v. Gray (1977), 173 Mont. 151, 159, 566 P.2d 1114, 1117. However, any alleged cost of hauling grain was negligible in this case because (1) Albers used his own grain truck to haul the grain at his own expense, and (2) the distance from the Bar ZF farmlands to Albers' grain storage facilities is nominal.

The Bar ZF also contends that the District Court erred when it failed to differentiate between sales of 1982 wheat and sales of wheat harvested in other years to compute loss of sales price of grain. The District Court calculated the average selling price of Bar ZF wheat from August 19, 1982, to May 9, 1983, and compared that to the reserve loan program price per bushel to determine loss of selling price of grain. We believe that this method of using average selling prices was reasonable under the circumstances. Accordingly, the District Court did not err in its calculation of loss of selling price of grain.

Finally, and again with regard to Albers' loss of sales price of grain, the Bar ZF asserts that the District Court erred by relying on market prices for grain sold before the date Albers could first qualify for the reserve loan program on June 1, 1983. Albers points out that his inability to

participate in the farm program, caused by Mrs. Lohr, forced him to sell his grain to meet expenses before June 1, 1983. He argues that it is only equitable to calculate loss of sales price of his grain based on the average price at which he was forced to sell his grain. We agree with Albers. Albers was in no position to wait until June 1, 1983, to sell his grain. The June 1, 1983 market price is, therefore, immaterial and the District Court did not err in using Albers' average selling price between August 19, 1982 and May 9, 1983.

The Bar ZF's third issue relates to the District Court's alleged errors in the calculation and award of interest. The Bar ZF first argues that Albers' damages are not "capable of being made certain by calculation." The Bar ZF relies on § 27-1-211, MCA, which provides as follows:

> Every person who is entitled to recover damages certain or capable of being made certain by calculation and the right to recover which is vested in him upon a particular day is entitled also to recover interest thereon from that day except during such time as the debtor is prevented by law or by act of the creditor from paying the debt.

To be entitled to prejudgment interest, Albers must meet three criteria previously recognized by this Court. Agrilease, 566 P.2d at 1118-1119. The criteria are: (1) an underlying monetary obligation; (2) the amount of recovery is capable of being made certain by calculation; and (3) the right to recover the obligation vests on a particular day.

The Bar ZF argues that the recovery in this case was not capable of being made certain by calculation and the right to recover did not vest on a particular day. Albers' damages, as evidenced by the District Court's calculations, were clearly calculable given historical average yields on

16

the Bar ZF and per bushel loan rates set under the farm program. Albers' right to recover these damages vested on the particular ASCS dates for deficiency payments, storage payments, and sale. Accordingly, the District Court did not err in awarding Albers prejudgment interest.

The Bar ZF next argues that prejudgment "interest awarded on the reserve loan program rate differential payment can only be awarded from June 1, 1983, which is the date the loan rate would first have been payable, and then only at 6% per annum until October 1, 1985, when § 31-1-106 was amended to 10% rather than the 10% awarded by the trial court straight through." We agree. Section 27-1-211, MCA, as previously set forth, only allows an award of interest from the date on which the right to recover vested. In this case, Albers would not have received the reserve loan program rate differential payment until June 1, 1983. Any award of interest must, therefore, be calculated from that date.

Prejudgment interest should be awarded in compliance with § 31-1-106, MCA. Byrne v. Terry (Mont. 1987), 741 P.2d 1341, 1344, 44 St.Rep. 1620, 1624. Prior to October 6, 1985, § 31-1-106, MCA, only allowed interest at 6% per annum. The statute was amended on that date to allow interest at 10% per annum. We find that Albers is entitled to prejudgment interest at 6% per annum until October 1, 1985, and at 10% per annum thereafter.

In its final issue, the Bar ZF argues that the District Court erred when it denied the Bar ZF's counterclaims. The Bar ZF sought damages for Albers' alleged failure to have good summerfallow and for his alleged failure to control noxious weeds. The District Court found that the counterclaims failed for lack of evidence. The District Court's findings in this regard must be clearly erroneous and must constitute an abuse of discretion to merit reversal.

Rule 52(a), M.R.Civ.P.; Walker v. Larson, supra. Our review of the record leads us to agree with the District Court.

It is undisputed that Mrs. Lohr, acting for the Bar ZF, released Albers from any obligation to leave summerfallow in a written agreement on May 5, 1982. Mrs. Lohr's summerfallow agreement was in exchange for Albers' promise not to recrop the Bar ZF. The Bar ZF contends that Albers gave Mrs. Lohr no consideration for the summerfallow agreement because Albers had no right to recrop. We disagree. Under the oral farm lease, Albers was charged with choosing the farming methods to be used on the Bar ZF. He chose to recrop after learning that Mrs. Lohr had retained a new tenant. We find that Albers gave up his right to recrop as consideration for Mrs. Lohr's summerfallow release.

The Bar ZF also alleges that Albers failed to control noxious weeds during his tenancy on the farm. The District Court heard testimony that tended to show a weed problem on the Bar ZF at all times before, during and after Albers' tenancy. Albers testified about his efforts to control weeds as did the subsequent tenant, Bronec. Albers produced receipts for costs of weed control and a witness who applied herbicides on the Bar ZF in 1981 at Albers' direction. Bronec guessed that he spent around $30,000 to control weeds in the three years after Albers left. The Bar ZF did not produce receipts as to exact costs of weed control nor did it attempt to prove how much of Bronec's approximations could be attributed to normal weed control on the Bar ZF.

The District Court also heard evidence to the effect that Albers was not responsible for controlling those weeds that grow on Bar ZF grasslands, coulees, and reservoirs. These weeds were to be controlled by the Bar ZF during Albers tenancy. In contrast, Bronec was responsible for controlling weeds on these grasslands for at least two of the three years

included in his cost approximations. Finally, the District Court heard evidence that the weeds on the 2,000 acres of Bar ZF grasslands were upwind of the Bar ZF farmlands and were a substantial factor in the spread of noxious weeds on the farmland. Given all of the above referenced facts, the District Court did not err in denying the Bar ZF's counterclaim with respect to noxious weed control.

The Bar ZF also counterclaimed for the alleged damage it contends Albers caused by not assuring compliance in the farm program. Given the disposition of the Bar ZF's first issue in this appeal, we cannot give this last contention serious consideration. Accordingly, the District Court judgment is affirmed in part, reversed in part, and remanded with instructions to recalculate prejudgment interest.

Affirmed in part, reversed in part.

_____
Justice

We concur:

_____
Chief Justice

_____

_____
Justices

19