**TRANSAMERICA PREMIER
INSURANCE COMPANY,
Plaintiff–Appellant,**

v.

**Ray MILLER;  Earl Robert Brown, Jr.;
et al., Defendants–Appellees.**

No. 93–35119.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 8, 1994.

Decided Nov. 17, 1994.

Ronald F. Waterman and Michael S. Lattier, Gough, Shanahan, Johnson & Waterman, Helena, MT, for plaintiff-appellant.

Joe Bottomly, Kalispell, MT, for defendants-appellees.

Before WRIGHT, WIGGINS, and THOMPSON, Circuit Judges.

## OPINION

WIGGINS, Circuit Judge:

Transamerica Premier Insurance Company ("Appellant") appeals from a district court's affirmance of a bankruptcy court's summary judgment holding Appellant liable to the customers of an escrow agent to whom Appellant had issued a bond. We affirm.

## FACTS AND PRIOR PROCEEDINGS

E. Robert Brown and his wife, Montana residents, owned an escrow business named Guaranty Escrow Services, Inc. ("GES"). GES purchased insurance through Cogswell Agency and agent Bill Gue. GES had a blanket fidelity bond from 1982–85 covering employee theft. GES dropped this bond in 1985. In 1985 Brown told Gue he wanted some insurance allowing him to say he "was bonded." Brown wanted each escrow account to be covered. He wanted to protect his customers and believed Gue had authority to get insurance that would do so.

Gue assigned Brown's request to John Leaf, another Cogswell agent. Leaf obtained Appellant's bond from Western States Bonding Agency, through agent Thomas Sauer. The bond read as follows, in pertinent part:

[T]he Transamerica Premier Insurance Company, Insurer, in consideration of an annual premium, agrees to reimburse the persons, firms or corporations, hereinafter called "Owner" whose names appear on the attached schedule and those whose names may be added to the schedule by endorsement, to the extent of Ten Thousand Dollars and 00/100 Dollars ($10,000.00), for direct loss of property including property for which the Owners are responsible, through any act of larceny or embezzlement established by criminal prosecution and conviction during the term of this insurance by ... [GES], while performing the duties of a[n] Escrow Agent in the service of the Owners.....

This insurance is subject to the following conditions: 1. The aggregate liability of the Insurer to any one Owner covered hereunder shall not exceed the sum of Ten Thousand Dollars.

Appellant supplied the bond, a form contract. No schedule naming the owner or owners was ever attached. The bond became effective November 15, 1985, for a one-year term, and was extended for two additional, one-year terms in 1986 and 1987.

Leaf does not remember seeing the bond or discussing the bond provisions or limits with Brown. Nor did Leaf discuss with Brown the schedule or the need to update it. Sauer had no actual authority to issue an indemnity bond with a penalty greater than $10,000. The annual premium for the bond was $125.00, some of which was retained by Cogswell.

On November 7, 1988, eight days before the bond period ended, Brown pleaded guilty to approximately 90 counts of felony theft for embezzling funds from his escrow clients from 1985 through 1988. Brown sometimes stole the entire amount of a prepaid lump-sum payoff that was entrusted to him by the buyer of real property for a payment to the seller. In such case, Brown would continue to pay monthly installments to the seller on behalf of the buyer, trusting that the seller would remain unaware of the payoff. Sometimes Brown simply wrote himself checks from the trust account. Brown tried to hide his embezzlement by floating some payments and by not paying some charges, such as taxes or insurance. The scheme eventually collapsed when Brown's cash flow needs exceeded his resources. Judgment of conviction was entered and Brown was sentenced on February 3, 1989.

After Brown was convicted and filed bankruptcy, the customers from whom he stole ("Appellees") looked to the bond for compensation. Appellant filed an adversary complaint in Brown's bankruptcy requesting a declaration of Appellant's obligations under the bond. The court certified Appellees as a class, whereupon Appellees answered and counterclaimed for compensation under the bond.

Appellees moved for summary judgment on the counterclaim. Appellant also moved

for summary judgment, contending that it owed nothing under the bond or, alternatively, that its maximum liability was $10,000. The bankruptcy court, Judge John L. Peterson, granted Appellees' motion and denied Appellant's motion. The district court affirmed.

After conducting a settlement conference on the issue of damages, Judge Peterson recused himself. His successor, Judge Donald MacDonald IV, directed pursuant to stipulation that sums owed under the bond be proved by deposition. The court also held that Appellees were entitled to prejudgment interest. Later, the court entered judgment against Appellant for $759,413.19, including $183,382.83 in prejudgment interest. Following cross-motions for amendment, the court in an amended judgment set damages at $699,626.58, including $172,774.98 in prejudgment interest. The district court affirmed. Appellant timely appealed.

## DISCUSSION

A grant of summary judgment is reviewed de novo. *Jones v. Union Pac. R.R. Co.,* 968 F.2d 937, 940 (9th Cir.1992).

### 1. Conviction

■ Under the bond, a "larceny ... established by ... conviction during the term of [the bond]" is prerequisite to reimbursement. Appellant argues that because judgment of conviction and sentence in Brown's criminal case was entered February 3, 1989, after the period of the bond had ended, the conviction prerequisite was not met. In support, Appellant notes that under a Montana statute, "conviction" is "a judgment of conviction or sentence entered upon a plea of guilty or upon a verdict or finding of guilty." Mont. Code Ann. § 45–2–101(15). *State v. Fisher,* 190 Mont. 295, 620 P.2d 1215 (1980), held that a guilty plea "cannot be equated with" conviction, at least for purposes of enhancing a later sentence. *Id.* at 1217. Appellant also notes that the bankruptcy court determined prejudgment interest from the date of judgment of conviction and sentencing, reasoning that Appellees' right to recovery "vested" under the bond on that day under Montana's

prejudgment interest statute and section 45–2–101(15).

We are not persuaded. The bond does not define conviction. "The word 'conviction' is susceptible to two meanings—an ordinary or popular meaning which refers to the finding of guilt by plea or verdict, and a more technical meaning which refers to the final judgment entered on a plea or verdict of guilty." *State v. Wagenius,* 99 Idaho 273, 277, 581 P.2d 319, 323 (1978); *State v. Dassinger,* 294 N.W.2d 926, 927–28 (S.D.1980); *Summerour v. Cartrett,* 220 Ga. 31, 136 S.E.2d 724, 725 (1964). Even with reference to criminal cases, in which a technical meaning might be expected, sometimes "[a] plea of guilty is tantamount to conviction." *Forstner v. INS,* 579 F.2d 506, 507 (9th Cir.1978), *cert. denied,* 439 U.S. 1071, 99 S.Ct. 841, 59 L.Ed.2d 36 (1979); *see United States v. McCroskey,* 681 F.2d 1152, 1153 (9th Cir.) (holding that a plea of guilty in state court followed by imposition of probation (but withholding of judgment of conviction) constitutes a conviction), *cert. denied,* 459 U.S. 1019, 103 S.Ct. 383, 74 L.Ed.2d 515 (1982); *United States v. Benson,* 605 F.2d 1093, 1095 (9th Cir.1979) (holding that a plea of guilty, accepted by the trial court, constitutes a conviction for purposes of 18 U.S.C. § 922(h)(1)); *see also Boykin v. Alabama,* 395 U.S. 238, 242, 89 S.Ct. 1709, 1711, 23 L.Ed.2d 274 (1969) ("A plea of guilty ... is itself a conviction....").

Further, a guilty plea fulfills the purposes of the bond's "conviction" requirement. The purpose is to ensure that the thief or embezzler is guilty; his sentence is of no consequence to the insured or insurer. Moreover, holding that a judgment of conviction is required might pose obstacles to a bond's enforcement. Rarely would a person be found guilty and sentenced within a bond's year-to-year period. Presentence reports and other procedures might delay judgment until a bond has expired, foreclosing liability in many cases.

■ Ambiguities in a bond should be construed in favor of the assured and against the entity that drafted the bond. *Kohles v. St. Paul Fire & Marine Ins. Co.,* 144 Mont. 395, 396 P.2d 724, 725 (1964); *Farmers Alliance Mut. Ins. Co. v. Miller,* 869 F.2d 509, 511

(9th Cir.1989). Appellant supplied the bond. The ambiguous word "conviction"[1] is to be construed against Appellant.

Finally, Judge MacDonald's holding regarding the date from which prejudgment interest accrued did not address "conviction" as a condition of the contract. Judge Peterson resolved the "conviction" condition issue against Appellant earlier in the proceedings, and Judge MacDonald did not disagree with Judge Peterson in this regard. Moreover, Appellees have not appealed the district court's use of the date of sentencing as a date from which prejudgment interest may accrue.

### 2. Lack of a Schedule of Owners

Appellant contends the lack of a schedule identifying an "owner" or "owners" renders the bond indefinite and void. The bankruptcy court indicated (and the district court affirmed) that Appellant had waived this defense. Appellant claims the district erred in this regard because estoppel and waiver "cannot be invoked to expand insurance coverage or the scope of an insurance contract." *ABCD ... Vision, Inc. v. Fireman's Fund Ins. Cos.*, 304 Or. 301, 744 P.2d 998, 1001 (1987). Here, Appellant claims, waiver supplied a missing element to the bond-owners (several hundred of them). Appellant argues that the bond says nothing about customers, just owners. Because fidelity bonds usually protect owners of businesses from defalcations by employees, the more reasonable interpretation is that the bond protected Brown.

■ We are not persuaded by Appellant's arguments. The district court held the bond was unambiguous and clearly intended the customers of GES—all of them—to be owners. The bond protects "owners" from larceny committed by GES "while performing the duties of a[n] escrow agent in the service of the Owners." GES performed escrow services only for GES's customers. Moreover, Brown ordered the bond for his customers' protection. That the bond intends GES's customers to be owners seems clear. A bond need not state by name the persons protected as long as the persons may be ascertained by applying the description contained in the policy. *Providence Wash. Ins. Co. v. Stanley*, 403 F.2d 844, 849 (5th Cir.1968).

■ The district court therefore concluded that all of GES's customers were owners. That conclusion does not follow from the bond's language as a whole, however, because the number of owners, though unstated, appears to be limited. Though the bond is clearly meant to benefit those for whom GES served as an escrow agent, the bond also clearly evidences an intent to limit the number of owners to a set number of entities whom Appellant has agreed to protect: only those whose names appear on the schedule and those added by endorsement. The notion that "owner" could mean an indefinite number of entities is contrary to that provision of the bond. Moreover, the rule that insurance contracts are to be construed against the insurer does not provide a ground to affirm the district court, because construing the bond to insure an unlimited number of owners is contrary to its plain terms. For the foregoing reasons, we find that "owner" as used in the bond is ambiguous.

■ Appellant's waiver of the limiting term resolves this ambiguity, however. Generally, an insurer's issuance of a policy in the face of what appears to be a lack of sufficient information to allow the insurer to determine its risks estops the insurer from, or waives the insurer's right to, cite that lack of information as a ground for avoiding coverage. *E.g., Krauss v. Manhattan Life Ins. Co.*, 700 F.2d 870, 872–74 (2d Cir.1983) (holding an insurer estopped from denying $100,000 coverage (usually reserved for full-time employees) to a part-time employee who paid the premium for $100,000 coverage, was issued a policy purporting to give $100,000 coverage, and was never asked if he was only part-time or informed that he had less coverage);

---

**1.** *American Policyholders' Ins. Co. v. Portale*, 88 N.J.Super. 429, 212 A.2d 668, 671–74 (Ct.App. Div.1965), *overruled in part on other grounds by State Farm Mut. Auto. Ins. Co. v. Wall*, 92 N.J.Super. 92, 222 A.2d 282 (1966), also held "conviction" ambiguous when the word was found undefined in an application for insurance.

*Hood v. Security Ins. Co.*, 247 S.C. 71, 145 S.E.2d 526, 531 (1965) (holding insurer estopped from voiding coverage on ground that insured did not fully disclose prior illnesses about which the insurer did not inquire); *Flanagan v. Sunshine Mut. Ins. Co.*, 73 S.D. 256, 41 N.W.2d 761, 762 (1950) ("[W]here, [on] the face of an application, a question appears to be imperfectly or incompletely answered, or not answered ..., the issuance of a policy without further inquiry waives the want of, or the imperfection in the answer." (internal quotations omitted)).

■ Appellant issued the bond, renewed the bond, and continued to accept premiums even though no schedule was attached. Moreover, Brown and at least some of his customers relied on the presence of the bond. Brown said he told many of his customers that he was bonded for their protection. Therefore, Appellant either waived the term of the bond that limited its otherwise unlimited liability, or is estopped from asserting it. With the limiting term waived, only the promise to reimburse customers of GES remains.

■ Because we can discern who are "owners," the bond is not so vague as to be unenforceable. Moreover, the bond's plain intent to benefit GES's customers makes resort to extrinsic evidence regarding the parties' intent unnecessary.[2]

■ *ABCD* is inapposite. There, the insured claimed that the insurer waived exclusion clauses in the contract by failing to assert them in a letter denying the insured's claim. 744 P.2d at 1000. The waiver allegedly took place after the claim arose. In such a context, where there was no coverage because an exclusion applied, the insured's waiver could not create coverage. In this case, Appellant waived the bond's limiting term before the claims arose. Moreover, Appellant's waiver did not itself expand coverage but rather failed to limit the natural expansion of coverage that resulted from the open-ended clause describing those covered.

■ That Appellees did not raise in their answer waiver or estoppel as defenses to the "non-coverage" arguments of Appellant's complaint is irrelevant. Appellees' counterclaimed for coverage under the bond. By pleading this counterclaim, Appellees transformed estoppel and waiver from arguments in defense of Appellant's declaratory action to arguments in favor of their counterclaim. Thus, in this case there was no need to plead them affirmatively. Moreover, Appellant alleges no prejudice resulting from Appellees' failure to include those arguments in their answer.[3]

### 3. $10,000 Limit?

The bankruptcy and district courts held that the bond clearly intended that Appellant reimburse each owner for up to $10,000 for losses sustained. Appellant contends this holding was error. Appellant argues that its

2. Brown is probably not an owner under the bond. As GES's only employee, he is not one for whom GES would serve as an escrow agent. An escrow agent is an intermediary between buyer and seller. If Brown were either buyer or seller, he could not also serve as intermediary without becoming involved in a conflict of interest. Though extrinsic evidence might be introduced to show ambiguity in the bond, it may not be introduced to contradict the bond's provisions. *See Boyne, U.S.A., Inc. v. Mallas*, 236 Mont. 305, 769 P.2d 1235, 1237–38 (1989). Holding otherwise would allow the extrinsic ambiguity exception to swallow the parol evidence rule.

The mere fact that Transamerica charged a low premium for the bond does not indicate that Brown was an owner. The low premium might have been meant to buy insurance for ten customers rather than for Brown. Thus, the low premium is irrelevant to a determination of whether customers were intended to be "owners." Even if it were relevant, Transamerica may not complain about it now.

Finally, even if circumstances indicated that the Browns were owners, those circumstances would not preclude a finding that the customers were also owners. While Brown expressed concern about his company, he also said he thought his customers were covered under the bond. Transamerica's belief that it was insuring the Browns, assuming such a belief existed, does not show that the bond did not also insure the customers.

3. Appellees claim that Appellant's complaint lists the customers of GES "as assureds under the bond." Appellees are incorrect. The complaint lists the customers of GES as those "who have or may have claims against [GES] and may be entitled to a portion of the ... bond proceeds, in the event the court determines there is a liability obligation to such parties...."

**444**

total liability under the bond is limited to $10,000.

In support, Appellant contends that a "surety bond is simply a contract and should be interpreted ... so ... as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as ... is ascertainable...." *Treasure State Indus. v. Welch,* 173 Mont. 403, 567 P.2d 947, 948 (1977) (internal quotations omitted). Appellant contends that Brown did not know the limits of the bond and never discussed the issue, implying that Brown had no intent with respect to the limits. But Appellant notes evidence showing that Appellant intended the limit of liability to be $10,000. The premium for the bond was only $125 per year. Appellant contends that to apply a $10,000 limit to each customer would subject Appellant to unlimited liability, an absurd result considering the small premium.

The bond states, "The aggregate liability of the Insurer to any one Owner covered hereunder shall not exceed the sum of Ten Thousand Dollars" (the "Aggregation Clause"). But if the bond covers each customer up to $10,000, Appellant claims, (1) the Aggregation Clause would have said "each" rather than "any" and (2) both the word "aggregate" and the $10,000 limit in the insuring clause are superfluous. Moreover, Appellant claims, use of the singular "owner" in the Insuring Clause limits the liability under that Clause to the one, aggregate "owner" even if the owner may consist of several persons or entities. Appellant cites case law holding that a surety may not be liable for more than the amount stated in the bond because no surety would undertake an unlimited responsibility. *E.g., Leggett v. Humphreys,* 62 U.S. (21 How.) 66, 75, 16 L.Ed. 50 (1858) ("[S]ureties are never held responsible beyond the clear and absolute terms and meaning of their undertakings.").[4]

■■■ We conclude that the bond does not limit Appellant's liability to $10,000. Rather,

the bond provides a $10,000 limit per act and per owner. The bond's language is clear. The Insuring Clause limits the liability of Appellant to $10,000 to the "Owner" (which in the Insuring Clause includes collectively all entities who may be called an owner) for each loss of property "through any act of larceny or embezzlement." The Aggregation Clause limits the liability of Appellant "to any one Owner" to $10,000. The two clauses have different purposes. The Insuring Clause limits Appellant's liability per act of theft. The Aggregation Clause limits Appellant's liability to any one owner when the owner has been subject to multiple acts of theft. Because the intent of the parties can be ascertained from the writing alone, no reference to extrinsic evidence of the parties' intent (including the amount of the premium) is needed.[5] The parties' intentions should be ascertained from the bond alone, if possible. *United States Fid. & Guar. Co. v. Newman,* 656 F.2d 457, 459 (9th Cir.1981) (construing Montana law).

Appellant's counter-arguments are unavailing. Any interpretation of the Insuring Clause that limited Appellant's total liability to $10,000 would render the Aggregation Clause superfluous. Neither the word "aggregate" nor the $10,000 limit in the insuring clause are superfluous under our interpretation. Nor are the Aggregation and Insuring Clauses redundant. The Insuring Clause's reference to "Owner" in the singular shows only that the insuring clause limitation was meant to limit Appellant's liability "per act" rather than limit liability regardless of the number of acts or owners. Use of the word "any" rather than "each" in the Aggregation Clause is irrelevant: "each" and "any" reach an identical result. Finally, law providing that a surety may not be liable for more than the amount stated in the bond is inapposite. Here the bond's broad limits are clear.

Under the foregoing analysis, the district court correctly concluded that the $10,000

---

4. Appellant also cites Mont.Code Ann. § 28–11–411, which provides that a "surety cannot be held beyond the express terms of his contract."

5. A reference to the low premium is of little benefit to us in interpreting the Aggregation clause and $10,000 limit in the Insuring Clause.

The disparity Appellant notes between the relatively low premium and Appellant's potential risk is a result of Appellant's waiver of the bond term limiting the number of owners, not a faulty interpretation of the Aggregation Clause.

limits in the bond did not limit Appellant's total liability under the bond to $10,000. And the district court correctly determined that no owner could recover more than $10,000.

### 4. Public Policy and Misrepresentation

Appellant argues that public policy precludes an insured from insuring against his own dishonesty, citing *Employer's Admin. Servs., Inc. v. Hartford Accid. & Indem. Co.*, 147 Ariz. 202, 709 P.2d 559 (Ct.App.1985) [*EAS*]. In *EAS*, the court held that a corporation controlled by only two shareholders could not collect on an indemnity bond for losses caused by the shareholders' fraudulent acts. *Id.* at 563–64. Appellant asserts that to allow recovery on this bond is to allow Brown, who owned and controlled GES, to insure against his own fraudulent acts.

■ Appellant also argues that it should be excused from the bond because Brown was engaging in fraudulent acts covered by the bond at the time the bond was issued. Because Brown's fraud was material to the risks covered by the bond, Brown should have disclosed it. The district court held that Appellant was precluded from making this argument because, by the time Appellant raised it, the customers' rights in the bond had vested. Appellant claims this conclusion was incorrect because Appellant had no obligation until Brown was "convicted," i.e., sentenced. By that time, Appellant had denied liability.

We are unpersuaded. *McLane v. Farmers Ins. Exch.*, 150 Mont. 116, 432 P.2d 98 (1967), controls this case. In *McLane*, an auto policy was issued on May 22, 1964, and an accident occurred June 7th. By June 17th, the insurance company suspected that the insured on the policy had made misrepresentations on his application. The court ruled that these misrepresentations were not fatal to the recovery of the party the insured had injured in the auto accident, however, because the rights of the injured party "vested prior to the attempted rescission." 432 P.2d at 99–100. The same is true in the present case. The rights of the owners, Appellees, vested when Brown pleaded guilty. Appellant made no attempt to rescind or void the contract prior to that time. Thus, Brown's concealment of his fraud does not void the contract as to Appellees, under *McLane*.

Further, Appellant has presented no evidence that Brown was engaged in fraud when the bond became effective. Appellant points to Brown's testimony that he engaged in some fraud in 1985. However, the fraud may have begun after November 15, 1985. In the same deposition, Brown said that he did not know if misappropriation was taking place in November of 1985.

■ Finally, *EAS* is inapposite. *EAS* involved wrongdoers seeking to recover for their own wrongful acts. Here, the wrongdoer's customers—victims, not perpetrators, of the wrongful acts—are seeking to recover. Appellant has presented no support for the proposition that public policy prohibits the customers from recovering on this bond merely because Brown was guilty of wrongdoing.[6]

### 5. Prejudgment Interest

■ To award prejudgment interest under Montana law, a court must find that the amount of damages "is certain or capable of being made certain by calculation." *Byrne v. Terry*, 228 Mont. 387, 741 P.2d 1341, 1343 (1987). "Damages" in this case refers to the monetary harm Brown caused his customers. Appellant claims the "certainty" requirement was not met in this case and that the award of interest was error.

■ Appellant claims damages here were as uncertain as those in *Northern Montana Hosp. v. Knight*, 248 Mont. 310, 811 P.2d 1276, 1282 (1991) (involving damages for negligently designing and supervising the construction of a building). In *Knight*, the court stated that "no interest can run until a fixed amount of damages has been arrived at, either by agreement, appraisal, or judgment." *Id.* (emphasis and internal quotations omit-

---

6. The only other case cited by Appellant regarding this issue, *Farmer's & Merchants' State Bank v. United States Fidelity & Guar. Co.*, 28 S.D. 315, 133 N.W. 247, 249 (1911), contains facts essentially identical to those of *EAS* and is inapposite for the same reasons.

ted). Appellant contends that there was no agreement, appraisal, or judgment fixing damages in this case prior to final judgment. *See also Morning Star Enter. v. R.H. Grover, Inc.,* 247 Mont. 105, 805 P.2d 553, 559 (1991) (involving damages for failing to perform a construction contract in a workmanlike manner); *Heitz v. Heitz,* 244 Mont. 12, 795 P.2d 486, 489 (1990) (damages for breach of an oral rental contract); *Withrow v. Red Eagle Oil Co.,* 755 P.2d 622, 625 (Okla.1988) (damages from loss of productivity of a well); *McPherson v. Schlemmer,* 230 Mont. 81, 749 P.2d 51, 54 (1988) (damages for negligence); *Continental Townhouses East Unit One Ass'n v. Brockbank,* 152 Ariz. 537, 540–41, 733 P.2d 1120, 1123–24 (Ct.App.1986) (damages that were unliquidated); *First Nat'l Bank v. Bankers Dispatch Corp.,* 221 Kan. 528, 562 P.2d 32, 40 (1977) (citing to a "liquidation" standard). Uncertain damages precluded prejudgment interest in each of these cases.

Appellant further notes Appellees' inability to cite certain damage amounts to the bankruptcy court until the time of final judgment, the court's inability to decide on certain amounts, and the inability of others to determine certain amounts. Each entity to look at damages seems to have come up with different amounts at different stages in the litigation. Only in the final, amended judgment was an amount set.

For these reasons, Appellant claims this case differs from those in which Montana courts have granted prejudgment interest: *Albers v. Bar ZF Ranch, Inc.,* 229 Mont. 396, 747 P.2d 1347, 1354–55 (1987) (awarding interest for losses due to non-participation in a farm subsidy program, when damages were calculable using historical average yields and per bushel loan rates set under the program); *Byrne,* 741 P.2d at 1342–44 (awarding interest on damages for breach of a note for a set sum); *Price Bldg. Serv., Inc. v. Holms,* 214 Mont. 456, 693 P.2d 553 (1985) (awarding interest on damages from a cost-plus contract for which costs, once determined, were of certain value).

We will not disturb the district court's ruling regarding prejudgment interest. Although the total damages were not deter-mined conclusively until the time of judgment, absolute certainty is not required. Damages need only be ascertainable through calculation. *Byrne,* 741 P.2d at 1343. None of Appellant's arguments shows that the amount was not capable of being made certain. Capability is all that Montana law requires. Appellees made only three types of claims: (1) losses of monthly payments; (2) losses from budget accounts from which certain expenses were to be paid; and (3) losses of lump-sum payments. All of these losses were calculable mathematically (a loss to a budget account, for example, is measured by the amount of the expenses that cannot be met from the account).

Appellees' inability to establish a damages amount until the date of the amended judgment does not limit their right to prejudgment interest. This case involved several hundred claims and even more claimants. The factual research necessary to calculate these numerous claims undoubtedly took a long time. Moreover, mistakes and inconsistencies could easily arise as individual buyers and sellers miscalculated or misread the history. But neither the length of time necessary to make the calculation nor the fact that miscalculations occurred render the amount incalculable. Rather, the calculation made possible by the gathering of the numerous facts in this case made possible an "appraisal" similar to that mentioned by the court in *Knight.* 811 P.2d at 1282. Though Appellant implies that factual investigation made damages difficult to determine, Appellant does not argue that factual disputes precluded a calculation. Accordingly, Appellant does not contend on appeal that summary judgment on damages was inappropriate.

◼  Cases disallowing prejudgment interest are distinguishable. In *Knight, Morning Star, Withrow, Heitz,* and *McPherson,* factual disputes precluded prejudgment interest. No amount was ascertainable until after trial. In fact, Appellees point out, in *Heitz* the court allowed prejudgment interest on such damages as could be calculated from a clear rental rate for cattle pasture. 795 P.2d at 489. Only a small portion of the prejudgment interest was disallowed, that for damages relating to grazing fees for horses, because the fee rate was unclear until certain factual disputes were adjudicated. *Id.* In

Montana, damages need not be liquidated but need only be ascertainable through calculation. *Brockbank* and *Bankers Dispatch Corp.* are therefore inapposite.

The instant case is rather more like *Albers,* in which damages were calculable once facts necessary for the calculation had been gathered. *See* 747 P.2d at 1355. Similarly, in *Holms* prejudgment interest could not be calculated on the damages for breach of a cost-plus contract until evidence of the costs had been gathered. *See* 693 P.2d at 559. These cases show that a Montana court would affirm the district court's prejudgment interest ruling.

### CONCLUSION

For the foregoing reasons, we affirm. The bankruptcy court and district court correctly interpreted and construed the bond. Prejudgment interest was appropriate.