DA 06-0505

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2008 MT 2

MONTANA PETROLEUM TANK RELEASE
COMPENSATION BOARD,

        Plaintiff, Appellee and Cross-Appellant,

    v.

CRUMLEYS, INC., d/b/a KENECO PETROLEUM EQUIPMENT;
NORMAN EXCAVATING, INC.; D & L SERVICES, a General
Partnership and Its General Partners, DOUG DANDRO and
LEONARD WALLIS; and DOES 1-25,

        Defendants,

FEDERATED SERVICE INSURANCE COMPANY.


        Defendant and Appellant.

------------------------------------------------------------------------

FEDERATED SERVICE INSURANCE COMPANY,

        Cross-Claimants,

    v.

CRUMLEYS, INC., d/b/a KENECO PETROLEUM EQUIPMENT;
NORMAN EXCAVATING, INC., D & L SERVICES, a General
Partnership and Its General Partners, DOUG DANDRO and
LEONARD WALLIS,

        Cross-Defendants.


APPEAL FROM:    District Court of the First Judicial District,
                     In and For the County of Lewis and Clark, Cause No. BDV 01-107,
                     Honorable Jeffrey M. Sherlock, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Christian T. Nygren and Michael J. Milodragovich, Milodragovich, Dale, Steinbrenner & Nygren, P.C., Missoula, Montana

Laura J. Hanson, Meagher & Geer, PLLP, Minneapolis, Minnesota

For Appellee:

R. Allan Payne, Doney Crowley Bloomquist Payne Uda P.C., Helena, Montana

Submitted on Briefs:  July 25, 2007

Decided:  January 3, 2008

Filed:

Clerk

2

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 The Montana Petroleum Tank Release Compensation Board ("the Board") brought suit in the First Judicial District Court against Federated Service Insurance Company ("Federated"), seeking to recover the costs of cleaning up a leak from an underground diesel tank owned and operated by Visocan Petroleum Company ("Visocan"), Federated's insured. The District Court granted partial summary judgment to the Board, and found that the Board, as Visocan's subrogee, had the authority to assert Visocan's rights and claims against Federated. The District Court held that the leak was partially covered under a portion of the insurance policy, and that Federated had breached its duty to indemnify Visocan. The District Court also held that the Board could recover any other damages that arose from Federated's breach. A jury awarded the Board $25,317.50 in administrative costs as consequential damages. Federated appeals from both the District Court's grant of partial summary judgment, and the jury's award of consequential damages. We affirm.

¶2 We restate the issues as follows:

¶3 I. Is the Board authorized to enter into subrogation agreements with owner/operators for the purpose of seeking reimbursement from insurers and other liable third parties?

¶4 II. Did the District Court err in concluding that diesel fuel was a pollutant as defined in the policy?

¶5     III. Did the District Court err in partially granting the Board's motion for summary judgment, and finding that the 120-hour notice provision did not bar coverage for the leak?

¶6     IV. Did the District Court err in deciding that the Board, as a subrogee of Visocan's breach of contract claim, could recover its administrative costs as consequential damages of Federated's breach?

¶7     V. Was the evidence proferred by the Board at trial admissible and sufficient to support the jury's award of consequential damages?

¶8     VI. Did the District Court err in failing to award the Board, as the prevailing party, its costs, attorneys' fees, and pre- and post-judgment interest?

## BACKGROUND

¶9     Visocan Petroleum Company owned and operated the Conoco Pop-Inn, a service station located in Helena, Montana.  In the fall of 1998, Visocan installed a new 4,000 gallon diesel fuel tank as part of an upgrade of the Pop-Inn station.  The new system was equipped with a leak detection monitor.

¶10    Roughly one week later, Visocan first noted discrepancies between the fuel levels registered by the system's leak detection equipment and the corresponding inventory and sales records.  Visocan contacted the tank's installer, D & L Services, multiple times over the next few months to report the ongoing discrepancies.  D & L visited the site to check the system several times.  They concluded that there was no fuel leak, and that a calibration error was responsible for the discrepancies.

4

¶11 The discrepancies between the fuel levels and the inventory records persisted. On February 12, 1999, Keneco (a subsequent purchaser of D & L) performed an on-site "stick test." The test determined that the tank had lost 500 gallons of fuel in two hours. Visocan took the tank out of service the same day. On February 25, 1999, Steve Visocan, the president of Visocan, received a letter from the DEQ demanding a response to the diesel leak. The record does not reflect who reported the leak to the DEQ.

¶12 On March 3, 1999, Keneco dug up the storage tank. After entering the tank, an investigator observed a twenty-two inch crack on the south cap of the tank. The crack was the apparent source of the leak, but it was not conclusively determined what caused the crack. Visocan speculated that the damage was done by a backhoe during the tank's installation in the fall of 1998. On March 8, 1999, Steve Visocan reported the leak to Pat McCutcheon, Federated's local agent.

¶13 Under Montana's Comprehensive Environmental Cleanup and Responsibility Act, §§ 75-10-705 – 75-10-729, MCA, Visocan was responsible for the payment of the clean-up costs of the spill. Pursuant to the Petroleum Storage Tank Cleanup Act, §§ 75-11-301 – 75-11-321, MCA, and the Montana Underground Storage Tank Act, §§ 75-11-501 – 75-11-526, MCA, the Montana Petroleum Release Board would reimburse Visocan for eligible corrective action costs not covered by Visocan's insurance policy with Federated. Visocan signed a subrogation agreement with the Board, as required by Admin. R. M. 17.58.332(5). This agreement transferred all of Visocan's rights against third parties liable for the leak and any claims it had against its insurers over to the Board. Visocan reserved its right to seek reimbursement for costs not reimbursed by the Board.

5

¶14 Visocan held general and umbrella commercial liability and property insurance policies from Federated. These policies contained a standard absolute pollution-exclusion clause which disclaimed all coverage for spills resulting from pollutants. The policy defined "pollutants" to include "liquid . . . irritant[s] or contaminant[s]." Visocan also held a coverage extension (hereinafter Endorsement CP-F-83), which provided for up to $100,000 of coverage for "expense[s] to extract 'pollutants' from land or water . . . ." This coverage extension contained a notice provision which required Visocan to report any damage or loss to Federated within 120 hours of the occurrence of the loss.

¶15 Visocan sought reimbursement from Federated under its applicable policies, and also submitted claims to the Board for reimbursement for the corrective action costs. Federated denied Visocan's claims for reimbursement via letter dated April 22, 1999, citing Visocan's failure to give timely notice under the 120-hour notice requirement.

¶16 The Board accepted Visocan's claims for reimbursement for corrective action costs, and its transfer of claims and rights against Federated and other third parties under an agreement dated April 13, 2000. The Board then proceeded to seek reimbursement from Federated for the cost of the clean-up. Federated denied all of the Board's requests for reimbursement.

¶17 This litigation ensued, and the Board sought recovery of the corrective action costs from Federated, including administrative costs and fees. The District Court partially granted the Board's motion for summary judgment. The court held that no coverage existed under the commercial general liability portion of the policy (hereinafter "CGL") or under the petroleum products distributors' coverage forms. However, the District

6

Court did find that coverage for the leak existed under Endorsement CP-F-83.  Thus, the District Court found that Federated had breached its duty to indemnify Visocan's loss resulting from the leak.

¶18     The District Court also found that the Board, as Visocan's subrogee, was entitled to recover all damages resulting from Federated's breach, including administrative costs. A jury trial was then held to determine whether the Board incurred additional administrative expenses for handling the Visocan claims as a result of Federated's breach, and which expenses it could recover as consequential damages.  The jury found that the Board did incur additional administrative expenses as a result of Federated's breach, and that it was entitled to $25,317.50 in additional damages.

¶19     Federated appeals the jury's verdict and damage award, as well as multiple parts of the District Court's Order on Various Motions.

## DISCUSSION

¶20     **I.   Is the Board authorized to enter into subrogation agreements with owner/operators for the purpose of seeking reimbursement from insurers and other liable third parties?**

¶21     Federated challenges the validity of Admin. R. M. 17.58.332(5) (2001), which authorizes the Board to enter into subrogation agreements with tank owners seeking reimbursement.  This rule establishes the Board's right to "subrogation claim[s] against insurance carriers whose policies cover . . . reimbursed costs." Admin. R. M. 17.58.332(5) (2001).  As a prerequisite to eligibility for reimbursement, the rule requires tank owners and operators to subrogate their rights to any claims under their insurance

7

policies to the Board. Admin. R. M. 17.58.332(5) (2001). Federated argues that the Board exceeded its authority in making this rule, because the Legislature only authorized the Board to seek funding from a limited number of sources. The Legislature delineated these sources in § 75-11-313(2)(a-e), MCA, and, Federated argues, intentionally did not include subrogation among them.

¶22 The District Court rejected Federated's argument, and found that the Board did have authority to seek reimbursement of the corrective action costs from Federated. The court based its holding on two alternative grounds: first, the court found, the Board had the power to enter into subrogation agreements under the existing statutory scheme prior to the 2001 amendment of Admin. R. M. 17.58.332. The court held that §§ 75-11-313 and 318, MCA, and Admin. R. M. 17.58.332 (1999) provide the Board with a right to statutory subrogation that is independent of, and precedent to, the 2001 amendment to Admin. R. M. 17.58.332. The court concluded that since "the Board had the right to seek subrogation from Federated prior to the April 2001 amendment to ARM 17.58.332, it may continue to do so in this case," and denied Federated's motion for summary judgment.

¶23 The District Court did not end its discussion there, but went on to find that Visocan had made a valid contractual assignment of its rights against Federated to the Board. In an April 13, 2000, agreement, Visocan assigned to the Board all rights and claims it had against its insurers, and any rights and claims it had against third parties liable for the release. Visocan retained the right to seek reimbursement for costs not reimbursed by the Board.

8

¶24 We agree with the District Court that the Board has a statutory right of subrogation, and that the subrogation agreement between Visocan and the Board is valid. The underlying statutory scheme gives rise to a right of statutory subrogation, irrespective of the 2001 amendment. Admin. R. M. 17.58.332(5) (2001), which requires owner/operators to enter into a subrogation agreement with the Board, is, nonetheless, entirely consistent with the Board's statutory right to seek reimbursement through subrogation.

¶25 The Board's authority to seek funding through subrogation is established in the first instance through the statutory scheme laid out by the Legislature in Title 75, Chapter 11, MCA. To begin, § 75-11-313(2)(b), MCA, specifically directs the Board to deposit "money received by the board in the form of . . . reimbursements . . . from any source" into the Fund. The term "reimbursements" encompasses (and indeed, seems to specifically contemplate) money the Board receives from insurers or other liable third parties, whether by subrogation or other agreement. Section 75-11-318, MCA, delineates the powers and duties of the Board. This section specifically authorizes the Board to "undertake legal action." Section 75-11-318(3), MCA. These references, individually and taken as a whole, lead us to conclude that the Board possesses a statutory right to seek reimbursement through subrogation, and to enforce its rights in a court of law. Thus, prior to the 2001 amendment, the Board possessed the authority to seek reimbursement through subrogation.

¶26    In 2001, the Board amended Admin. R. M. 17.58.332 to recognize its statutory right to seek reimbursement through subrogation and to facilitate enforcement of that right by requiring a written subrogation agreement from the owner/operator:

> To the extent the board may reimburse or has reimbursed owners or operators for eligible costs, the board has a subrogation claim against insurance carriers whose policies cover the reimbursed costs and against other third parties whose acts or omissions render them otherwise liable for the reimbursed costs. An owner or operator who accepts reimbursement for costs subrogates his rights to the board as against such insurance carriers and other third parties to the extent of the accepted reimbursed costs. An owner or operator, prior to receiving reimbursement of eligible costs, must agree on a form provided by the board, to subrogate its claims to the board to the extent of the accepted reimbursed costs.

Admin. R. M. 17.58.332(5) (2001).

¶27    The Board possessed clear authority to adopt this rule. The Legislature gave the Board the ability to "adopt rules . . . governing submission of claims," and to enact "other rules necessary for the administration of this part." Section 75-11-318(5)(a),(f), MCA. Section 2-4-305, MCA, provides that "[w]henever by . . . statute a state agency has authority to adopt rules . . . a rule is not valid or effective unless it is: (a) consistent and not in conflict with the statute and (b) reasonably necessary to effectuate the purpose of the statute." Section 2-4-305(6), MCA. Admin. R. M. 17.58.332(5) (2001) meets both those requirements. The rule, which requires owner/operators to subrogate their claims against responsible parties to the Board, is consistent with the Board's existing power of statutory subrogation. Further, as discussed in more detail below, subrogation is necessary to effectuate the purpose of the entire Act. Consequently, this rule (which facilitates and requires subrogation agreements) is reasonably necessary to effectuate the

purpose of the statute. Thus, we conclude that under § 75-11-318, MCA, the Board has the power to enact an administrative rule requiring owners to subrogate their claims against insurers.

¶28 The dissent argues that the Board has overstepped its statutory authority by requiring owners and operators to sign subrogation agreements, because administrative agencies may not "engraft additional and contradictory . . . [or] additional, non-contradictory requirements on the statute which were not envisioned by the legislature." *Board of Barbers, etc. v. Big Sky College, etc.*, 192 Mont. 159, 161, 626 P.2d 1269, 1270 (1981) (citations and internal quotation marks omitted). However, § 75-11-307, MCA, clearly states that "[s]ubject to the availability of money from the fund . . . an owner or operator who is eligible under 75-11-308 and who complies with 75-11-309 *and any rules adopted to implement those sections* must be reimbursed by the board . . . ." Section 75-11-307, MCA (emphasis added). Thus, the Legislature, not the Board, made compliance with §§ 75-11-308 – 75-11-309, MCA, and the accompanying administrative rules a prerequisite to reimbursement.

¶29 Finally, Federated claims that Admin. R. M. 17.58.332(5) (2001) is invalid because it is inconsistent with the purpose of the statutory scheme. To the contrary, we conclude that subrogation serves the Legislature's express stated purpose. Section 75-11-301, MCA, states that the Act's purpose is to "provide adequate financial resources and effective procedures through which tank owners and operators may undertake and be reimbursed for corrective action and payment to third parties for damages caused by releases from petroleum storage tanks[.]" Through subrogation, the Board can replenish

11

the Fund by seeking reimbursement from liable insurers. This allows the Board to fulfill the Act's purpose of ensuring "adequate financial resources" are available to all eligible tank owners and operators. Therefore, we conclude that subrogation is consistent with—not contrary to—the Act's purposes.

¶30    In sum, Title 75, Chapter 11, MCA, provides the Board with the statutory authority to seek reimbursement of corrective action expenses through subrogation. By virtue of this existing right to statutory subrogation, the Board had the authority to enact Admin. R. M. 17.58.332(5) (2001). Thus, the subrogation agreement between Visocan and the Board made pursuant to Admin. R. M. 17.58.332(5) (2001) is valid and enforceable. Consequently, we hold that the District Court did not err in denying Federated's motion for summary judgment on this issue.

¶31    **II. Did the District Court err in concluding that diesel fuel was a pollutant as defined in the policy?**

¶32    On cross-appeal, the Board argues that the District Court erred in determining that diesel fuel was included in the policy's definition of pollutant, and thus that the leak was excluded from coverage under the CGL portion of the policy. We review a district court's grant of summary judgment de novo, using the criteria established by M. R. Civ. P. 56(c). *State Farm Mut. Auto Ins. Co. v. Gibson*, 2007 MT 153, ¶ 9, 337 Mont. 509, ¶ 9, 163 P.3d 387, ¶ 9. The interpretation of an insurance contract is a question of law for the court. *State Farm*, ¶ 9. We review a district court's conclusions of law to determine whether they are correct. *State Farm*, ¶ 9.

¶33 A. Background principles of insurance contract interpretation

¶34 Several key principles guide us in interpreting insurance policies. First, in interpreting an insurance policy, we read the policy as a whole, and "if possible, reconcile its various parts to give each meaning and effect." *Farmers Alliance Mut. Ins. Co. v. Holeman*, 1998 MT 155, ¶ 25, 289 Mont. 312, ¶ 25, 961 P.2d 114, ¶ 25 (citations omitted). If the parties dispute the meaning of a term, we determine whether the term is ambiguous by viewing the policy from "the viewpoint of a consumer with average intelligence but not trained in the law or insurance business." *Farmers Alliance Mut. Ins. Co.*, ¶ 25 (citation omitted). An ambiguity exists "when a contract taken as a whole in its wording or phraseology is reasonably subject to two different interpretations." *Jacobsen v. Farmers Union Mut. Ins. Co.*, 2004 MT 72, ¶ 19, 320 Mont. 375, ¶ 19, 87 P.3d 995, ¶ 19 (citation omitted).

¶35 However, "[t]he counter-balance rule to the foregoing is that if the language is clear and explicit this Court may not rewrite an insurance contract, but must enforce it as written. . . . This Court has held, in fact, that expectations which are contrary to a clear exclusion from coverage are not objectively reasonable." *Lee v. USAA Cas. Ins. Co.*, 2001 MT 59, ¶ 30, 304 Mont. 356, ¶ 30, 22 P.3d 631, ¶ 30 (citations omitted). Further, "[c]ourts should not . . . seize upon certain and definite covenants expressed in plain English with violent hands, and distort them so as to include a risk clearly excluded by the insurance contract." *Mecca v. Farmers Insurance Exchange*, 2005 MT 260, ¶ 9, 329 Mont. 73, ¶ 9, 122 P.3d 1190, ¶ 9.

¶36    To begin, we note that the term "pollutant" appears in both Endorsement CP-F-83 and in the main CGL policy.  In both places, the term is defined identically: "Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed."  The Board essentially argues that we should construe the term "pollutant" to include diesel under Endorsement CP-F-83, but exclude it under the CGL policy.  Logic will not permit such a result, however favorable to the Board.  The contract must be read as a whole, *Farmers Alliance Mut. Ins. Co.*, ¶ 25, and identical terms must be given the same meaning and construction throughout the policy.  The definition of "pollutant" must either include diesel or exclude diesel, and must be read consistently throughout the policy.

¶37    B. Are the terms of the pollution-exclusion clause ambiguous?

¶38    As discussed above, the question of whether a term is ambiguous is viewed from the standpoint of an average consumer not trained in the law or insurance business.  *Farmers Alliance Mut. Ins. Co.*, ¶ 25.  However, this Court will not read ambiguity into a contract where there is none.  *Mecca*, ¶ 9.

¶39    The clause at issue in the instant case is known in the industry as a "standard pollution exclusion clause," and is commonly used by insurers nationwide.  We must determine whether the term "pollutant" is ambiguous, and more specifically, whether diesel fuel is included in its definition.  Though many of our sister states have previously considered this exact issue, the question is one of first impression for this Court.  The

14

precedent of these other states, though not controlling, is instructive in our analysis of this issue.

¶40    1. *A survey of pollution-exclusion clause jurisprudence*

¶41    Federated has defended the identical clause at issue in this case in multiple other jurisdictions. Each court to consider the Federated pollution-exclusion clause has held that it is not ambiguous, and that motor fuels are clearly included in the definition of pollutant. *Federated Mut. Ins. Co. v. Abston Petroleum, Inc.*, 967 So.2d 705, *7 (Ala. 2007); *Harrison v. R.R. Morrison & Son, Inc.,* 862 So.2d 1065, 1072 (La. App. 2 Cir. 2003); *North Georgia Petroleum v. Federated Mut. Ins. Co.*, 68 F. Supp. 2d 1321, 1327 (N.D. Ga. 1999); *Legarra v. Federated Mut. Ins. Co.*, 42 Cal. Rptr. 2d 101, 106 (Cal. App. 3 Dist. 1995); *Crescent Oil Co. v. Federated Mut. Ins. Co.*, 888 P.2d 869, 873 (Kan. App. 1995).

¶42    The same conclusion was reached by courts considering policies issued by companies other than Federated, but with identical absolute pollution-exclusion clauses. *Wagner v. Erie Ins. Co.*, 801 A.2d 1226, 1232 (Pa. Super. 2002), *aff'd*, 847 A.2d 1274 (Pa. 2004); *Owners Ins. Co. v. Farmer,* 173 F. Supp. 2d 1330, 1332-33 (N.D. Ga. 2001); *Truitt Oil & Gas Co. v. Ranger Ins. Co.*, 498 S.E.2d 572, 574 (Ga. App. 1998); *Millers Mut. Ins. of Ill. v. Graham Oil*, 668 N.E.2d 223, 228-29 (Ill. App. 2 Dist. 1996); *Heyman Assoc. v. Ins. Co. of State of Pa.*, 653 A.2d 122, 131-33 (Conn. 1995).

¶43    A minority of courts, by contrast, have found the same pollution-exclusion clause to be ambiguous. *State Auto Property & Cas. Ins. Co. v. Arkansas Dept. of Environmental Quality*, ___ S.W.3d ___ (Ark. 2007) ("[T]his court continues to believe

that the pollution-exclusion language is subject to different interpretations."); *Anderson Gas & Propane v. Westport Ins. Co.*, 140 S.W.3d 504, 508-509 (Ark. App. Div. 2 2004) (finding that the pollution-exclusion clause was ambiguous and reversing the grant of summary judgment); *Hocker Oil v. Barker-Phillips-Jackson*, 997 S.W.2d 510, 518 (Mo. App. 1 Dist. 1999).

¶44     In *Hocker*, the Missouri Court of Appeals applied a layman standard to determine whether the clause was ambiguous: "Missouri's criteria for determining whether an insurance policy's language is plain and unambiguous requires ascertainment of what the layman who acquired the policy of insurance would ordinarily have understood." *Hocker*, 997 S.W.2d at 518.  The court then reasoned:

> Hocker is in the business of transporting, selling, and storing gasoline on a daily basis.  Gasoline is not a pollutant in its eyes.  Gasoline is the product it sells.  Gasoline belongs in the environment in which Hocker routinely works . . . .  [I]n that environment, gasoline is not a pollutant.

*Hocker*, 997 S.W.2d at 518.  The court found the provision to be ambiguous, and then construed it in favor of the insured, holding that gasoline was not encompassed in the definition of "pollutant."  *Hocker*, 997 S.W.2d at 518.

¶45     In sum, our survey of case law concerning the standard absolute pollution-exclusion clause reveals that a clear majority of states have held that motor fuels are included in the clause's definition of "pollutant."  Missouri is one of two states to reach a contrary result.  At first glance, Missouri's layman standard is similar to Montana's average consumer standard.  However, an important difference exists between the two: Montana's standard is an objective one, while Missouri's is subjective.

16

¶46    *2. Is the term pollutant ambiguous from the viewpoint of the average consumer?*

¶47    We have previously held that a policyholder's expectations "which are contrary to a clear exclusion from coverage are not objectively reasonable." *Lee*, ¶ 30. The Missouri Court of Appeals relied on the subjective expectation of the petroleum station owner to reach its conclusion that petroleum was not a pollutant. By contrast, Montana's "average consumer" standard is an objective one. We view the term through the "objectively reasonable" perspective of the average consumer, not through the eyes of Visocan, or any other single policyholder. The policy defines "pollutants" to include "liquid . . . irritant[s] or contaminant[s]." Visocan's expectation that diesel fuel is not included in the category of "liquid . . . irritant[s] or contaminant[s]" is contrary to the clear terms of the policy.

¶48    Considering the issue from the objective viewpoint of a consumer with average intelligence, we conclude that most consumers would consider diesel a pollutant when it leaks into the ground and contaminates soil and groundwater. As the Supreme Court recognized, even a valuable and useful product can become a pollutant when it contaminates a natural resource. *United States v. Standard Oil Co.*, 384 U.S. 224, 226, 86 S. Ct. 1427, 1428 (1966) (rejecting the argument that oil was not refuse, and holding that it became a pollutant once it leaked into the river). Similarly, motor fuel—though commercially valuable to the gas station owner and useful to consumers—becomes a pollutant once it has leaked into the soil. *Federated Mut. Ins. Co.*, 967 So.2d 705, at *6.

¶49    In sum, we hold that the terms of the pollution-exclusion clause are not ambiguous. Viewed from the objective perspective of the average consumer, we

17

conclude that diesel is included in the clause's definition of the term "pollutant." This is evidenced by both the clear language of the policy, and by the obvious hazards diesel fuel poses to community health and safety once it has leaked into the soil. Thus, the District Court did not err in concluding that diesel fuel was a pollutant as defined in the policy.

¶50 **III. Did the District Court err in partially granting the Board's motion for summary judgment, and finding that the 120-hour notice provision did not bar coverage for the leak?**

¶51 The District Court granted summary judgment in favor of the Board, finding that the leak was covered under Endorsement CP-F-83. The Endorsement required that Visocan give notice of the leak to Federated within 120 hours of the occurrence; the District Court found that Visocan satisfied this requirement. Alternately, the District Court held, even if Visocan failed to give timely notice, the notice provision itself violated public policy and could not be enforced.

¶52 We review a district court's grant of summary judgment de novo, using the criteria established by M. R. Civ. P. 56(c). *State Farm*, ¶ 9. The moving party bears the burden of proving that no genuine issues of material fact exist, and as a result, that they are entitled to judgment as a matter of law. *State Farm*, ¶ 9. In Montana, the interpretation of an insurance contract is a question of law. *State Farm*, ¶ 9. We review a district court's conclusions of law to determine whether they are correct. *State Farm*, ¶ 9.

¶53 The Board argues that the 120-hour notice provision found in Endorsement CP-F-83 violates public policy because it does not comply with the statutory requirements of the Property and Casualty Insurance Policy Language Simplification Act, §§ 33-15-333 –

18

33-15-340, MCA ("Insurance Simplification Act"). Section 33-15-337(2), MCA, provides that "[t]he policy must include a table of contents and notice section of important provisions." Federated admits that there is no mention of the 120-hour notice provision in the policy's table of contents, or in a special notice section of important provisions. Federated's failure to highlight the 120-hour notice provision in a table of contents or notice section is a clear violation of § 33-15-337(2), MCA.

¶54 Federated concedes that the policy does not meet these statutory requirements, but argues that the provision should be strictly enforced nonetheless because this Court has previously upheld shorter notice periods. However, each case that Federated cites was decided well before the Insurance Simplification Act was adopted. Further, the fatal problem with the policy is its failure to conform to the requirements of the Act, not the brevity of its notice period.

¶55 A contract provision that is "contrary to an express provision of law" is unlawful. Section 28-2-701(1), MCA. Contract provisions which violate express statutes are contrary to public policy and void. *Belgrade Educ. Ass'n v. Belgrade School Dist.*, 2004 MT 318, ¶ 17, 324 Mont. 50, ¶ 17, 102 P.3d 517, ¶ 17 (citations omitted).

¶56 Courts will not enforce an illegal contract or contract provision. *MPH Co. v. Imagineering, Inc.*, 243 Mont. 342, 349-50, 792 P.2d 1081, 1086 (1990). By "refusing to enforce such contracts the court does not act for the benefit, or for the preservation of the alleged rights, of either party, but in the maintenance of its own dignity, the public good, and the laws of the state." *McManus v. Fulton*, 85 Mont. 170, 182, 278 P. 126, 131 (1929) (citation omitted).

19

¶57 Federated further argues that even if the 120-hour notice provision is void under the Insurance Simplification Act, the Court has no power to enforce the Act. Section 33-15-338(2), MCA, gives the Insurance Commissioner "sole authority to enforce the provisions of 33-15-333 through 33-15-340 or to seek remedies for its violation." This provision may bar a private right of action under the Insurance Simplification Act, but does not bar the courts of this state from performing their constitutionally designated roles in interpreting and upholding the law. Mont. Const. art. VII, § 1; *Best v. Police Dept. of City of Billings*, 2000 MT 97, ¶ 16, 299 Mont. 247, ¶ 16, 999 P.2d 334, ¶ 16 ("It is the province and duty of the judiciary 'to say what the law is' . . . .") (citing *Marbury v. Madison*, 5 U.S. 137, 177 (1803)). The Act does not prevent this Court from determining that the notice provision in the policy before us violates the laws of this State, and from refusing to enforce it.

¶58 We agree with the District Court's conclusion of law that the 120-hour notice provision is void and unenforceable as a matter of public policy, because it is contrary to statute. Because we conclude that the Endorsement's notice provision violates public policy, it is unnecessary to consider whether Visocan's notice was timely.

¶59 **IV. Did the District Court err in deciding that the Board, as a subrogee of Visocan's breach of contract claim, could recover its administrative costs as consequential damages of Federated's breach?**

¶60 Federated appeals the portion of the District Court's partial grant of summary judgment in favor of the Board which found that Visocan was entitled to "all damages resulting from Federated's breach of contract, regardless of the fact that Federated only

20

breached one portion of the policy." Specifically, Federated appeals the District Court's finding that Visocan (and thus the Board) could recover its administrative costs as consequential damages. We review a district court's grant of summary judgment de novo. *State Farm,* ¶ 9. We review a district court's conclusions of law to determine whether they are correct. *State Farm*, ¶ 9.

¶61 A subrogee stands in the shoes of the subrogor, and thus cannot stand in any better position than the insured. *Petroleum Tank Release*, ¶¶ 15, 31, 33 (citations omitted). To determine whether the Board could recover its administrative expenses, we must first ask what Visocan, the insured, was entitled to recover.

¶62 <u>A. What damages is Visocan entitled to recover as a result of Federated's breach?</u>

¶63 Under Montana law, an insured is entitled to "all damages" which result from a breach of contract by the insurer. *Grindheim v. Safeco Ins. Co. of America*, 908 F. Supp. 794, 808 (D. Mont. 1995) (applying Montana law). An insured's remedies for breach of duty to indemnify include both legal and equitable remedies. *Mountain West v. Brewer*, 2003 MT 98, ¶ 36, 315 Mont. 231, ¶ 36, 69 P.3d 652, ¶ 36 (awarding attorney's fees to insured); *Safeco Ins. Co. v. Munroe*, 165 Mont. 185, 192, 527 P.2d 64, 68 (1974) (holding that insured was entitled to consequential damages).

¶64 Section 27-1-311, MCA, sets out the measure of damages for a breach of contract:

> For the breach of an obligation arising from contract, the measure of damages, except when otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment which was proximately caused thereby or in the ordinary course of things would be likely to result therefrom. Damages which are not clearly ascertainable in both their nature and origin cannot be recovered for a breach of contract.

We have observed that this section generally permits recovery for two types of damages: proximate and consequential. *Martel Const., Inc. v. State*, 249 Mont. 507, 511, 817 P.2d 677, 679 (1991) (citation omitted). Consequential damages are those damages "within the contemplation of the parties when they entered into the contract, and such as might naturally be expected to result from its violation." *Martel*, 249 Mont. at 511, 817 P.2d at 679 (citation omitted).

¶65　B.　Do the administrative costs of the corrective action qualify as consequential damages?

¶66　Visocan is entitled to recover its administrative costs as consequential damages if the costs were contemplated by both parties at the time the contract was entered into, and if they might naturally be expected to result from Federated's refusal to indemnify. In *Safeco*, we held that in the context of a similar insurance policy, the term damages was used "without limitation." *Safeco*, 165 Mont. at 192, 527 P.2d at 68. We rejected the insurer's argument that the policy did not contemplate the award of consequential damages, noting that the policy did not contain any provision explicitly excluding consequential damages. *Safeco*, 165 Mont. at 192, 527 P.2d at 68. Similarly, the policy at issue here does not contain any provision excluding consequential damages.

¶67　*1. At the time of the contracting, did the parties contemplate the administrative costs of corrective action?*

¶68　The language of the policy indicates the parties did in fact contemplate the coverage of the administrative costs of a clean-up. Endorsement CP-F-83 states:

> This Additional Coverage Extension does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants". [sic] But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

This clause shows that Federated expected to reimburse Visocan for more than the cost of just the extraction. Coverage under the policy included management and oversight costs such as testing performed over the course of the clean-up. Further, the terms of policy are worded broadly: "We will pay your expense to extract 'pollutants' from land or water . . . ." The policy does not qualify or limit the term "expense," except to place a $100,000 ceiling on the coverage. In sum, the terms of the policy itself suggest that both parties expected that coverage would include the administrative costs of a clean-up.

¶69   *2. Are the administrative costs incurred by the Board a natural consequence of Federated's breach?*

¶70   Next, we consider whether the Board's administrative costs might naturally be expected to arise from Federated's breach. As parties with experience in either insuring or operating stations with underground petroleum tanks, both Visocan and Federated could have expected that a clean-up effort would require some administrative oversight and coordination. Section 75-11-309, MCA, details the administrative procedures and oversight involved in a petroleum tank leak clean-up. If Federated did not assume these duties, they would have inevitably been assumed by Visocan or the Board. Thus, the administrative costs are a natural consequence of Federated's breach.

¶71   The administrative costs are recoverable as consequential damages because they were anticipated by the parties at the time of contracting, and they might naturally be

expected to result from Federated's breach. Thus, the District Court did not err in its conclusion of law that the Board was entitled to recover its administrative costs as consequential damages.

¶72 **V. Was the evidence proferred by the Board at trial admissible and sufficient to support the jury's award of consequential damages?**

¶73 In support of its claim for consequential damages, the Board offered into evidence Exhibit 2, a chart containing the average cost per clean-up claim received and cost per claim paid for the fiscal years 1999 through 2005. The Board offered this summary of its own data pursuant to M. R. Evid. 1006. Federated objected to the admission of this summary chart on the grounds that it was inadmissible hearsay, speculative, and that the proper foundation was not laid. The court overruled the objection and allowed the chart to be introduced. On appeal, Federated argues that the chart should have been excluded from evidence because it did not meet the proper foundation requirements for M. R. Evid. 1006, and that it contained inadmissible hearsay. Federated also challenges the sufficiency of the evidence.

¶74 A. Was the summary contained in Exhibit 2 admissible?

¶75 District courts have broad discretion in controlling the admission of evidence at trial. *Seltzer v. Morton*, 2007 MT 62, ¶ 65, 336 Mont. 225, ¶ 65, 154 P.3d 561, ¶ 65 (citations omitted). When reviewing a district court's evidentiary ruling, we do not evaluate whether we would have made the same decision. *Seltzer*, ¶ 65. Rather, we review only for abuse of discretion. *Seltzer*, ¶ 65. A trial court abuses its discretion when it "act[s] arbitrarily without conscientious judgment or exceed[s] the bounds of reason."

24

*Lopez v. Josephson,* 2001 MT 133, ¶ 14, 305 Mont. 446, ¶ 14, 30 P.3d 326, ¶ 14. We will not reverse the district court's ruling unless the abuse of discretion constitutes reversible error. *Seltzer*, ¶ 65. Reversible error occurs when a substantial right of the appellant is affected, or when the challenged evidence affected the outcome of the trial. *Seltzer*, ¶ 65.

¶76 M. R. Evid. 1006 provides that:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at a reasonable time and place. The court may order that they be produced in court.

To date, we have not formally recognized any foundation requirements for M. R. Evid. 1006. *Barrett v. Larsen*, 256 Mont. 330, 337-38, 846 P.2d 1012, 1017 (1993), *overruled in part on other grounds*, *Giambra v. Kelsey*, 2007 MT 158, 338 Mont. 19, 162 P.3d 134, (holding that the plain language of the rule does not impose any foundational requirement to make the underlying documents available before trial).

¶77 However, the Commission on Rules of Evidence notes that M. R. Evid. 1006 is "identical" to Fed. R. Evid. 1006. M. R. Evid. 1006 advisory comm. nn. As both parties point out, Fed. R. Evid. 1006 conditions admissibility of summaries upon a showing of two foundational requirements. First, the underlying materials upon which the summary is based must be admissible into evidence. Second, the underlying materials must be made available to the opposing party for inspection. We now adopt these foundational requirements, and consider whether they were satisfied in the instant case.

¶78    *1. Were the underlying documents independently admissible?*

¶79    The Board argues that the underlying documents and records were independently admissible pursuant to three hearsay exceptions: the M. R. Evid. 803(6) business activity exception, the M. R. Evid. 803(8) public agency records exception, and the M. R. Evid. 803(24) hearsay "catch-all" exception. Exhibit 2 summarizes the Board's expenditures and number of claims it received and paid from fiscal year 1999 to fiscal year 2005. This information is commonly available as a matter of public record. M. R. Evid. 803(8) provides for the admission of:

> [R]ecords, reports, statements, or data compilations in any form of a public office or agency setting forth its regularly conducted and regularly recorded activities, or matters observed pursuant to duty imposed by law and as to which there was a duty to report, or factual findings resulting from an investigation made pursuant to authority granted by law.

¶80    Federated argues that because the summary contains information from "unidentified accountants," the exhibit was based on inadmissible hearsay. However, the Board's foundation witness testified that the data in the summary was pulled from records kept regularly by the DEQ and the state accounting system. The records of requests for reimbursements and records of expenditures were kept by the agency and its accountants as records regularly kept and matters observed pursuant to the duties imposed by §§ 75-11-301 – 75-11-321, MCA. Section 75-11-318(7), MCA, specifically requires the Board to make an annual report containing, among other things, an analysis of "trends in fund revenue and expenditure activity." The Board, of course, is a "public office or agency" within the meaning of M. R. Evid. 803(8). Section 2-15-2108, MCA. Thus, the documents underlying the summary are admissible pursuant to M. R. Evid.

803(8) because they qualify as "records, reports, statements, or data compilations in any form of a public office or agency setting forth . . . matters observed pursuant to duty imposed by law and as to which there was a duty to report . . . ." M. R. Evid. 803(8).

¶81    Having concluded that the underlying evidence is independently admissible pursuant to M. R. Evid. 803(8), we need not consider its admissibility under either M. R. Evid. 803(6) or 803(24). We now turn to the second foundational requirement: whether the Board made the documents available to Federated.

¶82    *2. Were the documents made available?*

¶83    Federated argues that the Board did not make the underlying documents available; however, the record belies this claim. The Board first announced its intention to introduce summaries of data pursuant to M. R. Evid. 1006 in its June 3, 2005, Disclosure of Lay Witnesses and Exhibits. In the Disclosure, the Board specifically noted that the summaries would be drawn from the Board's reimbursement files, the DEQ Site & Facility File, and "others as needed." The Board also had two boxes of the underlying documents (those specifically pertaining to the Visocan claims) present in court at trial. Further, all of the underlying documents were available as a matter of public record, and could have easily been obtained by Federated before the trial.

¶84    Some of the documents underlying Exhibit 2 were present in the courtroom. Yet Federated did not use these to cross-examine the Board's foundation witness or to challenge the summary. Further, Federated did not request that the other underlying documents be made available, or ask the District Court to order the materials to be produced in court.

¶85 In sum, the documents underlying the summary were independently admissible, and were made available to Federated both before and during trial. Thus, we conclude that Federated has failed to show that the District Court abused its discretion in admitting the summary contained in Exhibit 2.

¶86 B. Was the jury's verdict supported by substantial, credible evidence?

¶87 Our review of a jury verdict in a civil case is necessarily very limited, out of deference to the jury's constitutionally sanctioned decisional role. Mont. Const. art. II, § 26; *Kneeland v. Luzenac America Inc.*, 1998 MT 136, ¶ 53, 289 Mont. 201, ¶ 53, 961 P.2d 725, ¶ 53. Our task on review "is simply to determine whether the verdict is supported by substantial credible evidence, which is defined as evidence that a reasonable mind might accept as adequate to support a conclusion." *Seltzer*, ¶ 93 (citations omitted). Evidence will be considered substantial even where it is "inherently weak and conflicting" and "less than a preponderance." *Seltzer*, ¶ 93. However, it must be "more than a mere scintilla" and must not be "trifling or frivolous." *Seltzer*, ¶ 93. We view the evidence in the light most favorable to the prevailing party, who is entitled to any reasonable inference that can be drawn from the facts. *Seltzer*, ¶ 93.

¶88 Federated argues that the damage award issued by the jury was too speculative. Speculative damages "are not clearly ascertainable in both their nature and origin [and] cannot be recovered for a breach of contract." Section 27-1-311, MCA. *Cut Bank School Dist. No. 15 v. Rummel* provides an instructive illustration of speculative evidence. 2002 MT 248, ¶ 9, 312 Mont. 143, ¶ 9, 58 P.3d 159, ¶ 9. There, the only evidence that the non-breaching party offered to support its claim for damages was the testimony of the

contractor, who when asked to give a rough estimate of the cost to complete the project, said: "I don't know off the top of my head . . . between three and 4,000 [sic] total, maybe." *Cut Bank School Dist. No. 15*, ¶ 9. We concluded that without further evidence of actual cost, "such speculation is insufficient to prove damages to a reasonable degree of certainty." *Cut Bank School Dist. No. 15*, ¶ 9.

¶89 By contrast, the Board presented one witness and two exhibits to support its claim for consequential damages. The witness was a manager of the Board, and had worked for the Board for thirteen years. In his role as a manager, he oversaw Visocan's claims for reimbursement and clean-up efforts. He testified at length and in detail about the Visocan claims and clean-up efforts specifically, and about the Board's operation and claim review process more generally.

¶90 The Board's exhibits consisted of a record of 190 claims arising from the Conoco Pop-Inn spill (Exhibit 1), and a summary of the average cost per claim received and cost per claim paid for the fiscal years 1999 to 2005 (Exhibit 2). Exhibit 1 was an actual record from the Visocan case, while Exhibit 2 was a summary of the Board's cumulative claims data over the past six years. The Board's witness used these exhibits to testify that the average cost to the Board of processing a claim in the year 1999 was $1,179. The witness then testified that the first ten claims that Visocan submitted in 1999 represented about $100,000 in clean-up expenses. Using the average claim cost of $1,179 as a benchmark, the witness multiplied $1,179 by ten, reaching a total of $11,790. The Board only sought to recover the administrative costs associated with the first $100,000 of Visocan's 1999 claims because Endorsement CP-F-83 only provided $100,000 of

coverage for the leak. The Board's witness then used the same calculation method to estimate that it had incurred a total of $193,172 in costs for processing all 190 of the claims Visocan had submitted so far. Thus, relying on both the actual Visocan claims and the Board's summary claim data, the Board requested $11,790 in administrative costs.

¶91 We have held that "[a] plaintiff will not be denied recovery simply because it is too difficult to ascertain the amount of his damages, as long as the amount can be proven with a reasonable degree of certainty." *Sack v. A.V. Design, Inc.*, 211 Mont. 147, 153, 683 P.2d 1311, 1315 (1984). The plaintiff bears the burden of providing the trier of fact with "[a] reasonable basis for computation and the best evidence obtainable under the circumstances . . . which will enable the [trier of fact] to arrive at a reasonably close estimate of the loss . . . ." *Sack*, 211 Mont. at 153, 683 P.2d at 1315 (citations omitted). Here, the Board's witness testified that a more precise calculation of costs was not possible, and that the averaging method used by the Board produced the best and most reasonable estimate that could be identified. Federated presented no evidence to challenge this testimony.

¶92 We have made it clear that "[r]ecovery of damages will not be denied, even if the mathematical precision of the figure is challenged, provided the evidence is sufficient to afford a reasonable basis for determining the specific amount awarded." *Hallenberg v. General Mills Operations, Inc.*, 2006 MT 191, ¶ 32, 333 Mont. 143, ¶ 32, 141 P.3d 1216, ¶ 32 (citation omitted). Notably, Federated challenges the method of calculation used by the Board, not the accuracy of the figures quoted in the exhibits. As in the *Sack* case,

"Appellant simply claims the award is speculative, and offers no alternative method for computing damages." *Sack*, 211 Mont. at 153, 683 P.2d at 1315. Every award of damages is grounded, to some degree, upon speculation. *Sack*, 211 Mont. at 153, 683 P.2d at 1315.

¶93 Viewing the evidence in the light most favorable to the Board, and giving the jury its due deference, we hold that there is substantial evidence to support the jury's verdict. Though the Board's proferred method of calculating the damages may not be the most mathematically precise, it provides a reasonable basis for computation. The Board also offered the best evidence obtainable under the circumstances to support the award of damages. If Federated disagreed with the method used to arrive at the damage award, it should have presented an alternate method of calculation.

¶94 **VI. Did the District Court err in failing to award the Board, as the prevailing party, its costs, attorneys' fees, and pre- and post-judgment interest?**

¶95 A. As the prevailing party, is the Board entitled to its costs and attorneys' fees?

¶96 On cross-appeal, the Board argues that it is entitled to costs, attorneys' fees, and pre- and post-judgment interest as the prevailing party. However, at trial, the Board's own witness testified that the legal fees incurred by the Board in processing Visocan's claims were included in the administrative costs it requested as consequential damages. The Board's witness testified the first line item in Exhibit 2 (entitled "All Expenses") included the Board's legal services and contracts. Upon cross-examination, the witness testified that this line item specifically included the costs and fees charged by Mr. Payne

and his law firm for representing the Board in outside litigation. The witness further testified this average even included the cost of document production.

¶97 The Board submitted a request for an award of consequential damages for its administrative costs, which by its own witness's admission, included the legal fees and costs incurred in processing the Visocan claims. Since the jury's award of administrative costs specifically included attorneys' fees and costs, any post-trial award of costs or fees would constitute an impermissible double recovery.

¶98 <u>B. Is the Board entitled to pre- or post-judgment interest?</u>

¶99 When the amount of recovery is capable of being made certain, a prevailing plaintiff is entitled to recover prejudgment interest. Section 27-1-211, MCA. There are three prerequisites to recovery under this statute. First, an underlying monetary obligation must exist. Second, the amount of recovery must be capable of being made certain. Third, the right to recover must vest on a particular day. *Albers v. Bar ZF Ranch, Inc.*, 229 Mont. 396, 408, 747 P.2d 1347, 1354 (1987). Prejudgment interest is inappropriate, however, when the amount of a party's damages is uncertain or disputed. *Northern Montana Hosp. v. Knight*, 248 Mont. 310, 320, 811 P.2d 1276, 1282 (1991).

¶100 Here, the amount of damages that the Board was entitled to as a result of Federated's breach was not conclusively determined until the date that the jury returned the verdict—April 24, 2006. This judgment was made final by the court's order on May 16, 2006. We have consistently refused to award pre-judgment interest in cases where "the amount of damages due upon breach was not clearly ascertainable until determined by the trial court." *Northern Montana Hosp.*, 248 Mont. at 321, 811 P.2d at 1282

(citation omitted). Further, we have interpreted § 27-1-211, MCA, to mean that "no interest can run until a fixed amount of damages has been arrived at, either by agreement, appraisal, or judgment." *Northern Montana Hosp.*, 248 Mont. at 321, 811 P.2d at 1282 (citation omitted).

¶101 Because the amount of damages due upon breach was not certain until judgment was entered by the trial court, the Board is not entitled to pre-judgment interest. However, the Board is entitled by statute to post-judgment interest, at the rate of 10 percent per annum. Sections 25-9-204 – 25-9-205, MCA.

## CONCLUSION

¶102 In conclusion, we hold that Title 75, Chapter 11, MCA, provides the Board with statutory authority to seek reimbursement of corrective action expenses through subrogation. Thus, the Board had the authority to enact Admin. R. M. 17.58.332(5) (2001). As Visocan's subrogee, the Board was entitled to seek reimbursement for a portion of the clean-up cost from Federated and recover its administrative costs arising from Federated's breach. We affirm the District Court's finding that diesel fuel was included in the policy's definition of pollutant, and that Endorsement CP-F-83 provides $100,000 of coverage for the leak.

¶103 We also affirm the District Court's partial grant of summary judgment in favor of the Board, and hold that the Endorsement's 120-hour notice provision is void and unenforceable as a matter of law. The notice provision is contrary to the express requirements for insurance policies that the Legislature adopted in the Insurance

Simplification Act, §§ 33-15-333 – 33-15-340, MCA. Thus, Federated may not use the notice provision to deny Visocan coverage for the leak.

¶104 We conclude that the evidence submitted by the Board in support of its claims for consequential damages was admissible pursuant to M. R. Evid. 1006, and that it was sufficient to support the jury's award of consequential damages to the Board. We hold that the administrative costs that the Board recovered as consequential damages included its costs and attorneys' fees, and thus it may not seek to recover these costs and fees separately. Finally, we conclude that the Board is entitled to post-judgment interest, but not to pre-judgment interest, because the amount of damages was not sufficiently certain until the jury reached its verdict.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ PATRICIA COTTER
/S/ JAMES C. NELSON
/S/ BRIAN MORRIS

Justice Jim Rice dissenting.

¶105 The Court's conclusion that the Board acted within its statutory authority when it required Visocan to assign its contractual rights against Federated in order to obtain reimbursement from the fund ignores our precedent and well-settled rules of statutory interpretation to draw a contrived meaning of the applicable statutes. Indeed, the Court concludes that the Legislature authorized the Board to pursue subrogation litigation on

34

the basis of one single, solitary word in the statutory scheme. The conclusion is untenable, and I dissent.

¶106 As a preliminary matter, it should be noted that the Board argues that Federated lacks standing to challenge the Board's subrogation of Visocan's claims. The Court ignores this threshold issue. An obligor has the inherit right to challenge the underlying assignment of claims because subrogation, as a form of assignment, is governed by contract law and subject to the same requisites for validity as are other contracts. 6 Am. Jur. 2d *Assignments* § 118 (2007). Accordingly,

> [w]hen suit is brought against the defendant by a stranger to his contract, he is entitled to proof that the plaintiff is the owner of the claim against him. This protection must be afforded to the defendant. Otherwise, the defendant might find himself subjected to the same liability to the original owner of the cause of action, in the event there was no assignment.

*McGuire Performance Solutions, Inc. v. Massengill*, 904 A.2d 971, 975-76 (Pa. Super. 2006) (emphasis in original omitted) (citing *Brown v. Esposito*, 42 A.2d 93, 94 (Pa. Super. 1945)). Therefore, "[i]n order for the assignee of contractual rights to maintain a cause of action, he must plead and prove the validity of his ownership of the claim." *Federal Deposit Ins. Corp. v. Barness*, 484 F. Supp. 1134, 1150 (D. Pa.1980). The validity of an assignment hinges on whether there was an assignable right. *Restatement (Second) of Contracts* § 324 (Comment a) (1981). Generally, contractual rights can be assigned <u>unless</u> (1) they materially alter the duty of the obligor, (2) the assignment is validly precluded by contract, or (3) ***the assignment is forbidden by statute or is otherwise inoperative on grounds of public policy***—the exception at issue here. *Restatement (Second) of Contracts* § 317(2) (1981). Where the contractual right is

unassignable, the assignment is invalid. 6 Am. Jur. 2d *Assignments* § 8 (2007) ("[o]nly those assignments that are not contrary to express law, public policy, or good morals are valid"). The local law of the state governs whether the contractual right is assignable. *Restatement (Second) of Conflict of Laws*, §§ 208, 209 (1971).

¶107 Here, Visocan was required by the Board to assign any rights it had against its insurer, Federated, to the Board. Accordingly, Visocan became the assignor and the Board the assignee. Federated remained the obligor. The Board, as assignee, subsequently brought suit against Federated for reimbursement of corrective costs expended by the Board and covered under the insurance policy. Because an assignment occurred, thereby incorporating a stranger into the original insurance contract, Federated could rightfully challenge the validity of the assignment. Allowing the current suit to proceed without determining the assignment's validity may expose Federated to multiple suits on the same claim. Under the tenets of contract law, Federated, as the obligor, has the inherent right to challenge the validity of the subrogation on the basis that the assignment violates Montana law, i.e., that the statute does not permit the Board to subrogate Visocan's contractual rights.

¶108 Turning to the merits of the subrogation issue, reaching the correct legal conclusion first requires a review of our law on this issue, which the Court largely ignores. When adopting a rule, the agency must comply with the requisites for rule validity codified in § 2-4-305, MCA, of the Montana Administrative Procedure Act. This section provides that "[w]henever by . . . statute a state agency has authority to adopt rules[,] . . . a rule is not valid or effective unless it is: (a) consistent and not in conflict

36

with the statute and (b) reasonably necessary to effectuate the purpose of the statute."

Section 2-4-305(6), MCA. In interpreting this statute, we have stated:

> The courts have uniformly held that administrative regulations are "out of harmony" with legislative guidelines if they (1) *"engraft additional and contradictory requirements on the statute"* (citation omitted); or (2) if they engraft additional, noncontradictory requirements on the statute which were not envisioned by the legislature. [Emphasis added.] [Citation omitted in original.]

*Board of Barbers v. Big Sky College*, 192 Mont. 159, 161, 626 P.2d 1269, 1270 (1981) (citation omitted). Moreover, we have held that "[r]ules adopted by administrative agencies which conflict with statutory requirements or exceed authority provided by statute, are invalid." *Haney v. Mahoney*, 2001 MT 201, ¶ 6, 306 Mont. 288, ¶ 6, 32 P.3d 1254, ¶ 6 (internal quotations omitted). *See also State ex. rel. Swart v. Casne*, 172 Mont. 302, 564 P.2d 983 (1977) (holding agency rules void because a statute cannot be changed by administrative regulations), *overruled on other grounds*, *Trs. of Ind. Univ. v. Buxbaum*, 2003 MT 97, 315 Mont. 210, 69 P.3d 663.

¶109 In first determining the statutory mandate given by the Legislature, it becomes particularly important to recall that our role "is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted." Section 1-2-101, MCA. For what the Legislature did not enact we may not allow the agency to implement. Thus, "we must pursue the intent of the Legislature and that intent is determined by interpreting the plain meaning of the language used." *Saari v. Winter Sports*, 2003 MT 31, ¶ 22, 314 Mont. 212, ¶ 22, 64 P.3d

1038, ¶ 22. Where the language used in the statute is "clear and unambiguous, the statute speaks for itself and we will not employ other means of interpretation." *Saari*, ¶ 22.

¶110 With these principles in mind, I turn to the Court's conclusions. The Court finds that Board's authority to pursue subrogation "is established in the statutory scheme" which granted the Board "clear authority" to adopt its subrogation rule, Admin. R. M. 17.52.332(5). Opinion, ¶ 27. The entire basis for this "clear authority" is a single word within § 75-11-313(2)(b), MCA, a financial accounting provision which creates the special revenue fund necessary to strictly account for the Board's funds pursuant to § 17-2-102, MCA. This provision requires any grants, gifts and "reimbursements" to be deposited into that special revenue account. It is this accounting directive to deposit "reimbursements" into a special revenue account upon which the Court's entire conclusion rests, for thereafter it simply points to the Board's general ability to take legal action. However, the Board cannot conduct legal action for things it has not been authorized to do.

¶111 In its scouring of the statute for a word or snippet which could reflect the Legislative authority it desperately seeks, the Court misses the obvious: within the pages of details about the functions of the Board and the program, subrogation is simply not discussed and authorized. "Subrogation" is not mentioned at all, even within the provisions one would expect to find it: those enumerating the powers or duties of the Board and authorizing the Board to adopt rules. *See* § 75-11-318, MCA. Nor is there any other discussion anywhere in the statutes about the Board pursuing claims against insurers which could be deemed to be in the nature of subrogation. Claims against an

38

owner's insurer are simply not contemplated. Indeed, a "claim" is defined only as "a written request prepared and submitted by an owner or operator" for the "reimbursement of expenses caused by an accidental release[,]" § 75-11-302(5), MCA, and a "corrective action" is defined as the "investigation, monitoring, cleanup, restoration, abatement, removal and other actions necessary to respond to a release." Section 75-11-302(6), MCA. "Third parties" are mentioned by the statute only for the purpose of authorizing reimbursement to owners who have made damage payments **_to_** third parties because of a spill. Section 75-11-301(6)(b), MCA.

¶112 Yet—on the basis of this one word, "reimbursement" (in an accounting mechanism statute)—the Court concludes that the Legislature "clearly authorized" the Board to force owners to transfer their insurance rights in order to qualify for reimbursement from the fund, and that the Board was thereafter authorized to pursue subrogation litigation on the basis of those assigned rights. Opinion, ¶ 27. If this is "clear authority," then agencies have just been released to do just about whatever they want.

¶113 Of course, it is not "clear authority." The action by the Board to require assignment of contract rights from owners is not authorized at all. Although the Court finds solace in the statute's authorization for the Board to adopt "other rules [as] necessary," § 75-11-318(5)(f), MCA, this general provision does not expand the substantive powers delegated to the agency, but rather authorizes the adoption of rules for implementation of truly clear powers. In short, the Court has gone outside its duty "to

ascertain and declare what is in terms or in substance contained" in the statute. Section 1-2-101, MCA .

¶114 Here, the reimbursement provision of the Act provides that, subject to the availability of funds, an owner, eligible under § 75-11-308, MCA, and compliant with both § 75-11-309, MCA, "and any rules adopted to implement those sections <u>must be reimbursed</u> by the board . . . ." Section 75-11-307(1), MCA (emphasis added). Section 75-11-307, MCA, clearly and unambiguously requires the Board to reimburse owners suffering an eligible spill so long as they have complied with §§ 75-11-308 and 309, MCA, and rules which would be properly adopted to implement these sections.

¶115 Admin. R. M. 17.58.332 is inconsistent with these statutory provisions and does not "implement" either § 75-11-308 or § 75-11-309, MCA. Regulation 17.58.332 contains the following provisions:

> (1) Prior to receiving payment for any claim for reimbursement, an owner or operator who is determined to be eligible under 75-11-308, MCA shall thoroughly investigate the existence of any policy of insurance or other similar instrument which may indicate insurance coverage for some or all of the eligible costs arising from a release.
>
> . . . .
>
> (5) To the extent the board may reimburse or has reimbursed owners or operators for eligible costs, the board has a subrogation claim against insurance carriers whose policies cover the reimbursed costs and against other third parties whose acts or omissions render them otherwise liable for the reimbursed costs. ***An owner or operator who accepts the reimbursement for costs subrogates his rights to the board as against such insurance carriers*** and other third parties to the extent of the accepted reimbursed costs. ***An owner or operator, prior to receiving reimbursement of eligible costs, must agree on a form provided by the board, to subrogate its claims to the board to the extent of the accepted reimbursed costs.*** [Emphasis added].

Admin. R. M. 17.58.332.

¶116 The above-highlighted portions of Admin. R. M. 17.58.332 illustrate the inconsistency between the Board's adopted rule and the statutory requirements for reimbursement. Pursuant to Admin. R. M. 17.58.332, in order to receive reimbursement for an eligible claim, the owner <u>must</u> subrogate its claims against any insurance carriers or third parties to the Board. However, § 75-11-307, MCA, plainly has only four requirements prior to reimbursement: (1) there are funds available (not at issue here); (2) there was an eligible spill (not at issue here); (3) the owner complied with § 75-11-309, MCA, which maps the procedures for reimbursement of eligible costs (also not at issue here); and (4) the owner complied with any other rules adopted to "implement" §§ 75-11-308 and 309, MCA. There is no statutory requirement that prior to reimbursement an owner must assign his insurance claim to the Board.

¶117 Thus, contrary to the Court's opinion, Admin. R. M. 17.58.332, does not "implement" either §§ 75-11-308 or 309, MCA. The term "implement" means "to carry out or perform." *American Heritage Dictionary* 880 (4th ed. 2000). The term "implement" refers to the procedural tools the Board may use in effectuating §§ 75-11-308 and 309, MCA. Admin. R. M. 17.58.332 does not concern the procedural mechanisms the Board uses to "implement" either §§ 75-11-308 or 309, MCA, but rather adds an additional requirement that owners must fulfill prior to receiving reimbursement from the Board. Consequently, Admin. R. M. 17.58.332 conflicts with the statute and is invalid pursuant to § 2-4-305(6), MCA. Therefore, based on the plain language and

meaning of § 75-11-307, MCA, the Board should have reimbursed Visocan for eligible costs without requiring Visocan to surrender its insurance claims to the Board.

¶118 The record reveals that the Board enforced Admin. R. M. 17.58.332 against Visocan—informing Visocan that further reimbursements would not be approved unless it assigned its insurance claims to the Board. While the Board's purpose in enacting the rule is arguably an important interest in preventing "double dipping," the Board lacks the statutory authority to enforce Admin. R. M. 17.58.332. Under this Court's precedent, the Board has engrafted additional requirements not envisioned by the authorizing statute. *See Board of Barbers*, 192 Mont. at 161, 626 P.2d at 1270. The Board has overstepped its statutory authority by requiring that owners subrogate its insurance claims to the Board before the Board reimburses eligible costs. Moreover, the Board's rule frustrates the legislative purpose of reimbursement in numerous respects. For instance, the rule prevents an owner from exercising his contractual right to seek reimbursement from his insurer for costs not covered by the fund, such as here, Visocan's statutory deductible of $17,500. This result was not envisioned by the Legislature. As such, Admin. R. M. 17.58.332 is invalid.

¶119 Consequently, any subrogation effected by the Board pursuant to Admin. R. M. 17.58.332 is invalid, including the assignment between Visocan and the Board. *See Restatement (Second) of Contracts* § 317(2)(b) (1981) (stating contractual rights are unassignable if forbidden by statute). Therefore, the remaining issues on appeal are moot because the Board cannot sustain a cause of action on the basis of an invalidly assigned contractual right.

¶120   I would reverse the District Court.


                                    /S/ JIM RICE